2006 ND 210

**In the Interest of T.A., S.A., D.J., and J.A., Minor Children.**

**Don Boehmer, Petitioner and Appellee,**

**v.**

**T.A., S.A., D.J., J.A., K.A., B.J., J.P., Respondents,**

**B.J., Respondent and Appellant.**

**No. 20060063.**

Supreme Court of North Dakota.

Oct. 17, 2006.

Benjamin C. Pulkrabek, Mandan, N.D., for respondent and appellant.

Gary L. Delorme, Assistant State's Attorney, Jamestown, N.D., for petitioner and appellee.

MARING, Justice.

[¶ 1] B.J. ("Brian"[1]) appeals the juvenile court's order terminating parental rights to his three minor children, S.A. ("Sarah"), D.J. ("Doug"), and J.A. ("Jenny"). We hold the juvenile court did not err in finding clear and convincing evidence the children have been deprived; the causes and conditions of deprivation are likely to continue; and, as a result of the continued deprivation, Sarah, Doug, and Jenny have suffered or will probably suffer serious physical, mental, or emotional harm if Brian's parental rights are not terminated. We affirm.

I

[¶ 2] Brian is the biological father of Sarah, Doug, and Jenny. The children's mother, K.A. ("Katherine"), whose parental rights were terminated, does not appeal. Katherine also has a child, T.A. ("Thomas"), with another man, whose parental rights are not at issue in this appeal. Katherine's parental rights to Thomas have been terminated. This matter involves Brian's parental rights to his three children. Sarah was born in 1999, Doug was born in 2001, and Jenny was born in 2002. Stutsman County Social Services ("Social Services") conducted an emergency removal of the children from Katherine's Jamestown, North Dakota, home on October 20, 2004, at which time the children were placed in foster care.

[¶ 3] Brian and Katherine had been involved in a relationship for several years. They first met when Brian was fifteen years old and Katherine was sixteen years old. Brian is now twenty-three. From ages fifteen to nineteen, Brian lived with Katherine. The couple then broke up for six months, lived together for six months, and then ended their relationship. They never married. Katherine eventually moved from Oklahoma to North Dakota, bringing the children with her. On October 20, 2004, Brian, Katherine, their children, and Thomas were living in Katherine's Jamestown home. Brian came from Oklahoma a couple of weeks earlier to stay with Katherine and their children when Katherine requested help from him with the children.

[¶ 4] Social Service's October 20, 2004, emergency removal of Sarah, Doug, and Jenny was based on numerous incidents. There had been reports the children walked unsupervised around town and had been left home unattended. The children had problems at school. On the day of the emergency removal, an empty alcohol bottle was on the front step of Katherine's house and piles of clothing and ashtrays full of cigarette butts were lying throughout the house. There were few indications, such as toys or pictures, that children lived at the house. There was very little food in the house. The children's beds were mattresses placed on the floor with single blankets on them, and Jenny was found lying naked in her crib. The children's foster mother noted the children's poor personal hygiene, Jenny's oversized pants and her lack of a diaper, and that the children lacked discipline. The foster mother also indicated the children did not receive Christmas or birthday gifts from Brian, and Brian failed to attend a scheduled supervised visit.

[¶ 5] Brian has a history of criminal activity that has affected his ability to spend time with his three children. On October 1, 2004, and again on October 10, 2004, Brian was charged with disorderly

1. The parties' names are pseudonyms.

conduct in North Dakota. On November 23, 2004, Brian was arrested in North Dakota for theft of property. After serving his sentence for the theft, Brian was released from jail on February 4, 2005, on eighteen months probation. Brian returned to Oklahoma the end of February. A month and a half later, Brian was placed in jail in Oklahoma. Brian was extradited to North Dakota and sentenced to jail for violating his probation by leaving North Dakota. Brian's release was scheduled for July 2006.

[¶ 6] After the emergency removal of the children on October 20, 2004, Brian did not have contact with Social Services until December 15, 2004, when Social Services contacted Brian. Social Services and Brian agreed to conduct parenting capacity and addiction evaluations after Brian's release from jail in February. After his release from jail, Brian visited Social Services and established a date to spend time with his children and to complete the evaluations. Brian failed to appear at the visitation and did not contact Social Services. Brian signed releases for parenting capacity and addiction evaluations, but did not have the evaluations performed. Brian claimed he was job searching in Fargo the day he was to visit with his children because he was under pressure from his probation officer to find a job. He claimed he missed the visitation with his children because he confused the dates. Social Services learned on February 15, 2005, that Brian had left North Dakota. Social Services did not have any type of contact with Brian again until July 2005 when Brian's grandmother talked with Social Services.

[¶ 7] Although the year is disputed, Brian testified that the children lived with him in Oklahoma for much of 2002. Brian's grandmother, cousin, and a family friend took turns watching the children while Brian was at work. Brian paid the friend for babysitting and paid for diapers and milk. Brian testified he took his children to a nearby park and had toys for them. Katherine then moved from Oklahoma to North Dakota and brought the children with her. In 2004, Brian came to North Dakota at Katherine's request. Brian claimed he took the children to a dentist during the short time he was in North Dakota in 2004. Brian did not present medical bills to support this claim. Brian claimed he deferred primary caretaking to Katherine and that he was incarcerated during the first time the children were found wandering around Jamestown and, by the second occurrence, the State already had custody. Brian indicated his family is willing to assist him in raising the children, he wants to keep his children, and he is willing to get help from social services.

[¶ 8] After the emergency removal, the children were placed in the temporary care and custody of Social Services. An adjudication hearing was held, at which time the children were placed in the care and custody of Social Services for one year. At a permanency hearing, the juvenile court ordered Social Services to retain care and custody for an additional year. Social Services petitioned to terminate the parental rights of Brian and Katherine. After the hearing, the juvenile court entered an order terminating Brian's parental rights.

[¶ 9] Brian appeals the order terminating his parental rights.

II

[¶ 10] To terminate a person's parental rights, the petitioner must prove the child is deprived; the conditions and causes of the deprivation are likely to continue or will not be remedied; and, that by reason thereof the child is suffering or will probably suffer serious physical, mental,

moral, or emotional harm. N.D.C.C. § 27–20–44(1)(b)(1). "The party seeking parental termination must prove all elements by clear and convincing evidence." *Interest of E.R.*, 2004 ND 202, ¶ 5, 688 N.W.2d 384. "Clear and convincing evidence means evidence that leads to a firm belief or conviction the allegations are true." *Adoption of S.R.F.*, 2004 ND 150, ¶ 7, 683 N.W.2d 913.

[¶ 11] Findings of fact by a juvenile court are not overturned unless clearly erroneous. N.D.R.Civ.P. 52(a). "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made." *Adoption of S.R.F.*, 2004 ND 150, ¶ 8, 683 N.W.2d 913. Under N.D.R.Civ.P. 52(a), "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

## A

[¶ 12] A deprived child is one "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian." N.D.C.C. § 27–20–02(8)(a). Proper parental care is met by exhibiting minimum standards of care that the community will tolerate. *Interest of J.R.*, 2002 ND 78, ¶ 9, 643 N.W.2d 699.

[¶ 13] Brian does not claim the juvenile court erred in finding his children were deprived as defined by N.D.C.C. § 27–20–02(8)(a).

## B

[¶ 14] Brian argues the juvenile court erred in finding clear and convincing evidence that the conditions and causes of the children's deprivation are likely to continue or will not be remedied.

[¶ 15] To prove deprivation is likely to continue or will not be remedied, the State must offer prognostic evidence that demonstrates deprivation will continue. *Interest of T.K.*, 2001 ND 127, ¶ 14, 630 N.W.2d 38. Past deprivation alone is not sufficient to prove deprivation will continue. *Interest of T.K.*, at ¶ 14. However, any prediction of the future requires some reflection on the party's past conduct. *Interest of T.F.*, 2004 ND 126, ¶ 19, 681 N.W.2d 786. "Prognostic evidence, including reports and opinions of the professionals involved, that forms the basis for a reasonable prediction as to future behavior must be evaluated in determining if a child's deprivation is likely to continue." *Interest of D.Q.*, 2002 ND 188, ¶ 21, 653 N.W.2d 713.

[¶ 16] Incarceration does not alone constitute continued deprivation, but the harm a parent's incarceration may cause the children "may be established by prognostic evidence that a parent's current inability to properly care for the child will continue long enough to render improbable the successful assimilation of the child into a family if the parent's rights are not terminated." *Interest of T.F.*, 2004 ND 126, ¶ 12, 681 N.W.2d 786. When a parent, voluntarily and without reasonable justification, makes himself unavailable to care for and parent young children, the children should not be expected to wait or assume the risk involved in waiting for permanency and stability in their lives. *Interest of E.R.*, 2004 ND 202, ¶ 9, 688 N.W.2d 384. "A parent's lack of cooperation in parenting classes or with social workers is probative, as is the parent's background." *Interest of E.G.*, 2006 ND 126, ¶ 10, 716 N.W.2d 469. Such lack of

parental cooperation is indicative of the likelihood deprivation will continue. *Interest of D.Q.*, 2002 ND 188, ¶ 21, 653 N.W.2d 713.

[¶ 17] Brian's history of incarceration in Oklahoma and North Dakota indicates the children's deprivation will not cease in any reasonable amount of time. At the time of the hearings, the evidence indicated Brian would be incarcerated until July 20, 2006. The evidence also established he had no contact with his children since October 2004 when they were removed from Katherine's home. By the time he would be released from prison, he would not have seen his children for almost twenty-one months. Brian's children cannot be expected to wait any longer for Brian to provide them with stability by staying out of jail. Furthermore, Brian admitted he would have a difficult time supporting his children, at least initially, because of a lack of money and housing uncertainty. Based on Brian's job history and past living arrangements, there is no indication Brian will be able to obtain stable employment or adequate housing sufficient to prevent continued deprivation.

[¶ 18] Brian has displayed an inability or lack of desire to be part of his children's lives for any prolonged period of time. Brian admittedly allowed Katherine to be the children's primary caretaker despite his knowledge of Katherine's limitations as a parent. Except for a brief time a few years back, Brian played a very small role in raising his children. Deprivation can result from habitual absence from the children's lives. "To terminate parental rights, a court need not await the happening of a tragic event." *Interest of T.K.*, 2001 ND 127, ¶ 17, 630 N.W.2d 38. The evidence supports the juvenile court's finding there is clear and convincing evidence the deprivation is likely to continue, and we conclude the finding is not clearly erroneous.

C

[¶ 19] To terminate a parent's rights, there must also be evidence that continued deprivation has led to the children suffering or will in the future probably result in physical, mental, moral, or emotional harm to the children. *Interest of D.D.*, 2006 ND 30, ¶ 23, 708 N.W.2d 900. "Assisting a parent to establish an adequate environment for the child by offering long term and intensive treatment is not mandated if it cannot be successfully undertaken in a time frame that would enable the child to return to the parental home without causing severe dislocation from emotional attachments formed during long-term foster care." *Interest of E.R.*, 2004 ND 202, ¶ 11, 688 N.W.2d 384. The risk of harm to children also may be proven by prognostic evidence. *Interest of E.G.*, 2006 ND 126, ¶ 15, 716 N.W.2d 469.

[¶ 20] Brian does not appeal the juvenile court's finding that there has been and probably will be harm suffered by the children because of his continued deprivation. The record supports that Brian's pattern of incarceration and failure to avail himself of assistance from Social Services have already led to his children suffering.

III

[¶ 21] We conclude the juvenile court's finding that there is clear and convincing evidence to support the termination of Brian's parental rights to Sarah, Doug, and Jenny is not clearly erroneous. The order is affirmed.

[¶ 22] GERALD W. VANDE WALLE, C.J., and CAROL RONNING KAPSNER, DALE V. SANDSTROM, and DANIEL J. CROTHERS, JJ., concur.