783 N.W.2d 12 (2010)
2010 ND 103
In the Interest of D.H., a child.
Heather Pautz, Barnes County Director of Social Services, Petitioner and Appellee
v.
D.H., a child, T.H., Mother, Respondents and
E.H., Father, Respondent and Appellant.
No. 20100109.
Supreme Court of North Dakota.
June 10, 2010.
*14 Fallon M. Kelly (argued), Special Assistant State's Attorney, Lisbon, ND, for petitioner and appellee.
Monty G. Mertz (argued), Fargo Public Defender Office, South, Fargo, ND, for respondent and appellant.
KAPSNER, Justice.
[¶ 1] E.H. (hereinafter "Eric," a pseudonym) appeals a juvenile court order terminating his parental rights to his child, D.H. (hereinafter "David," a pseudonym). We hold the juvenile court's findings that the conditions and causes of David's deprivation are likely to continue, and David will probably suffer serious harm as a result, are not clearly erroneous. We affirm.

I.
[¶ 2] Eric is David's father. Eric was born in 1978. When Eric was nineteen years old, he dated T.H. (hereinafter "Tonya," a pseudonym), for about six months. After Eric and Tonya separated, Tonya gave birth to David in 1998. Eric did not know Tonya was pregnant when they separated, nor did he know about David's birth at the time. Eric learned about David when David's guardian initiated a paternity suit in 2006. David and his half-sister had been placed under guardianship pursuant to an agreement with their mother Tonya, who was incarcerated at the time. Eric was also incarcerated when he received notice of the paternity action. Based upon the results of a DNA test, a juvenile court determined Eric was David's father. Eric did not request visitation rights, nor did the juvenile court award any. Eric met David for the first time shortly after the paternity suit, when they went to a restaurant with David's guardian and half-sister.
[¶ 3] David and his half-sister were removed from the guardian's care in December 2007. On January 3, 2008, Barnes County Social Services placed the siblings in a foster care home, and they have remained together in foster care since that time. On January 8, 2008, social services held a permanency planning meeting regarding David. Social services did not mail notice of this meeting to Eric, because his whereabouts were unknown at the time. However, social services mailed notices to Eric regarding all subsequent permanency planning meetings. After locating Eric, social services arranged a supervised visitation between Eric and David on February 29, 2008. Eric tested positive for marijuana at this visit. Eric attended two more supervised visits on March 1 and 4, 2008. On March 5, 2008, Eric failed to attend an appointment with social services to schedule a drug and alcohol evaluation. Eric also failed to attend a permanency planning meeting on March 11, 2008.
[¶ 4] Following the March 11th meeting, social services created a "Single Plan of Care" for David and his half-sister. The plan identified social services' permanency goal as "[r]eunification of the children with their mother with concurrent planning on assessing placement with [Eric]. . . ." If those options were unsuccessful, social services planned to pursue "termination of [Eric and Tonya's] parental rights and adoption for both children." The plan recommended Eric complete parental capacity and drug and alcohol evaluations, follow all recommendations based upon those evaluations, and attend additional supervised visits with David. From police records, social services discovered *15 Eric had been arrested for assault on March 18, 2008 in Valley City. Social services held a permanency planning meeting during April 2008 that Eric failed to attend.
[¶ 5] On May 8, 2008, a juvenile court dissolved the guardianship for David and adjudicated David to be a deprived child. The juvenile court also placed David under the custody of social services, where he has remained since that date. Eric appeared at the May 8th deprivation hearing, and the juvenile court ordered him to "submit to drug testing as requested by Barnes County Social Services." Social services held another permanency planning meeting on June 26, 2008. Eric spoke with a social services worker about the permanency plan prior to the meeting, but he did not attend the actual meeting. The progress report for the June 26th meeting indicates Eric did not agree with the permanency plan of pursuing reunification between David and his mother. Eric failed to attend the next permanency planning meeting on September 25, 2008.
[¶ 6] The juvenile court held a hearing to finalize the permanency plan for David on December 4, 2008. Eric appeared at the hearing and again tested positive for marijuana. The juvenile court ordered David to remain in foster care and the custody of Barnes County Social Services. The juvenile court's order stated the permanency plan was "reunification of [David] with his mother. . . . If reunification is not possible the plan is to establish a guardianship or terminate parental rights and allow the child to be adopted." With regard to Eric, the juvenile court stated: "[Eric] voices an interest in establishing a relationship with [David] with possible placement in the future." Eric attended a permanency planning meeting two weeks after the hearing, on December 18, 2008. The progress report for this meeting indicates Eric agreed with the permanency plan. Eric also attended a scheduled visitation with David in December 2008. Eric then missed several appointments and meetings with social services over the next two months.
[¶ 7] Eric failed to appear at social services on January 13, 2009 for a ride to a drug and alcohol evaluation. Social services rescheduled the evaluation for January 27, 2009, but Eric again failed to show. Eric also missed his next supervised visitation with David in February 2009. That same month, Eric was arrested and charged with felony aggravated assault. In June 2009, Eric entered an Alford plea to misdemeanor assault, thereby admitting sufficient evidence existed for a jury to find him guilty beyond a reasonable doubt, but not admitting he actually committed the crime. Eric was sentenced to time served for the assault. However, because the crime also constituted a parole violation, Eric remained incarcerated, with his release scheduled for May 2010. While incarcerated, Eric participated in a permanent placement meeting by telephone on September 24, 2009 and a supervised visitation with David in October 2009.
[¶ 8] On October 6, 2009, social services petitioned for termination of Eric and Tonya's parental rights to David. Tonya did not contest the petition and later signed a waiver of her parental rights. The petition claimed the juvenile court should terminate Eric's parental rights because Eric is currently incarcerated; has an extensive criminal record; lacks stable housing or employment; tested positive for marijuana on multiple occasions; failed to complete requested evaluations; and has only seen David approximately five times in his life despite numerous opportunities for additional visitation. The juvenile court held a hearing on the petition in December 2009. At the time of the hearing, *16 David had been in foster care for at least 450 out of the previous 660 nights.
[¶ 9] Social worker Sheila Oye testified about social services' work with Eric since David was removed from the guardian's care in December 2007. Oye stated social services had difficulty contacting Eric because he "has not had stable housing. He hasn't had housing in his name since I've been working with the case for two years." She testified social services would mail notices to Eric at his last known address or his sister's residence in Valley City, where Eric was known to periodically stay. Oye stated she explained social services' permanency plan for David to Eric on several occasions, and Eric indicated he understood each time. Oye testified social services primarily sought to reunite David with his mother, rather than Eric, because she "was the biological parent of both [David and his half-sister] and we wanted to keep the siblings together." Oye also stated reunification with David's mother was preferable because she acquired employment and a stable residence after her release from jail. Oye testified David has been diagnosed with "Adjustment Disorder with depressed mood," which could be aggravated by reunification with Eric.
[¶ 10] While social services' primary goal was reunification between David and his mother, Oye testified social services did not rule out the possibility of reunification between Eric and David. However, Oye stated such reunification never became a realistic option because Eric failed to cooperate with social services:
Our first steps were the parental capacity evaluation and the drug and alcohol evaluations. We helped arrange those appointments. I was providing transportation for [Eric]. He didn't show up to those. To my knowledge he has not completed those to this date. I did supervised visits to try to work towards unsupervised visits and he didn'twe had the two supervised visits and then we had a couple where he didn't show up. [Eric] has not kept Social Services informed of his residence. . . . So it's been difficult to provide [Eric] with services.
Oye also testified about Eric's criminal past. She stated social services discovered Eric had been arrested in March 2008 for "an altercation and an assault onwith a woman in Valley City." With regard to Eric's February 2009 arrest for aggravated assault, Oye stated the police report indicated Eric "appeared" to have committed "a very violent act." Oye stated Eric's offenses "have been escalating over the years."
[¶ 11] Crystal Noreen testified she and her husband are the foster parents with whom David and his half-sister have resided since February 2008. Since she became David's foster parent, Noreen stated Eric called her house to speak with David on one occasion, and Eric's sister also called once to set up a visitation between Eric and David. Noreen testified Eric could have called David more, as he knew their name and phone number. Noreen stated Eric failed to show for several scheduled visitations with David. To prevent David from feeling disappointed if Eric failed to show, Noreen stated she "would wait until the day of [the scheduled visitation] to tell [David] that he was gonna have a visit with his father rather than having him know weeks ahead of time and then have it be a big let down for [David] if it didn't happen."
[¶ 12] Finally, Eric testified on his own behalf. After first meeting David following the paternity action in 2006, Eric stated he asked David's guardian "if she could make [David and his half-sister] available every two weeks so that I couldwhen I had my paycheck I could use what funds I *17 had to come down andand see `em." Although no such arrangements were ultimately made, Eric stated he always intended to establish a relationship with David. Eric acknowledged he has never been solely responsible for a child, but Eric stated he has watched children as a babysitter and is comfortable with them. Eric stated he is capable of providing a stable environment for David, and he believes David's best interests would be served by eventually living with him full-time.
[¶ 13] Eric stated he only received a "few" of the notices for permanency planning meetings that social services mailed to him. Eric testified he generally provided social services with his current address. He added that Barnes County child support and law enforcement always knew his location, so social services should have too. Eric said he missed several visitations and meetings because of bad weather and his lack of a driver's license. Eric also addressed Oye's testimony about his lack of stable housing and employment over the past few years:
I lived for the longest time on my own when this time started inin Bismarck. I stayed there for over a year in my own apartment paying my own bills, and after moving there I moved to Montana and lived there and paid all the bills. When I left Montana and came back to Valley City I got an apartment with [a friend] and I had that apartment all the [way] up until the last two months of proceedings before I was arrested in Fargo [in February 2009]. And then previous to that I was staying with my sister and I put a change of address in every time I've moved.
During the same time period, Eric testified he worked as a floor maintenance technician, a cook, and a home repairman. Eric stated he considers this to qualify as a stable life because he always had a job and a place to stay.
[¶ 14] Eric testified social services never provided him with paperwork clearly outlining what specific actions he needed to take to ensure reunification with David. Eric stated Oye never requested he complete a parental capacity evaluation, though she did tell him that he needed to complete chemical dependency and psychological evaluations. Eric testified he completed those evaluations at a center in Valley City, signed a release of information form, and told Oye that social services could obtain the results. However, Eric said Oye told him she wanted the evaluations performed at the Human Services Center in Jamestown. Eric testified he did not comply with Oye's request to complete the evaluations at the Human Services Center. Eric stated he felt Oye "was just trying to frustrate mymy efforts and in all honesty II believe she was just out to`out to get me' kinda thing. I don't believe she ever really wanted me to be in [David's] life other than just paying child support."
[¶ 15] Eric also addressed his criminal history. At the age of fifteen, Eric testified he was adjudicated to be a delinquent child for committing burglary, and he was placed in the custody of the State until age eighteen. Eric stated he went to prison at age nineteen for an unidentified offense. In total, Eric testified he has been charged with more than ten crimes, some of which were felonies. Eric explained his most recent arrest for aggravated assault in February 2009. Eric stated the victim told police he banged her head against the ground, but he was really just holding her down to prevent her from hurting him or herself. Eric also testified about why he entered an Alford plea: "[W]hen I was first contacted by police that night I was holding her down. She was inflicting injury *18 upon herself and my idea of the law you have to have criminal intent and wish to cause bodily harm before you can be deemed an assault, but still having physical conunwanted contact on another person is stillstill not cool, so [I entered an Alford plea]."
[¶ 16] Eric stated he was presently incarcerated at a correctional center in Rugby, where he had participated in intensive cognitive restructuring therapy, addiction counseling, and anger management and positive motivation courses. Eric also stated he voluntarily completed numerous parenting courses after being incarcerated in February 2009. Eric testified he obtained a G.E.D. while previously incarcerated as well. On cross-examination, Eric admitted to knowing little about David personally, such as his favorite food, book, color, or school subject. Eric stated he has never talked to any of David's teachers, counselors, or physicians.
[¶ 17] The juvenile court issued an order terminating Eric's parental rights. The juvenile court found David was deprived, taking judicial notice of the May 2008 decision. The juvenile court also found the causes and conditions of David's deprivation were likely to continue and placement with Eric would be contrary to David's health, safety, and welfare. The juvenile court stated it made the latter findings because Eric: is currently incarcerated; has an extensive criminal record; has not maintained stable housing; tested positive for marijuana every time social services tested him; has been convicted for a "felony level violent crime"; failed to attend several permanency planning meetings; failed to abide by the permanency plan's recommendation; failed to complete parental capacity and drug and alcohol evaluations; failed to have regular contact with David; failed to attend several scheduled visitations; and only telephoned David once since March 2008.
[¶ 18] The juvenile court also found David had been in foster care for more than 450 of the last 660 nights. The juvenile court stated David "is suffering from Adjustment Disorder with Depressed Mood." Considering Eric's past behavior, including his lack of a stable residence and employment, the juvenile court found Eric would likely contribute to David's disorder. Finally, the juvenile court noted reuniting David with Eric would cause David to be separated from his half-sister, with whom David has lived his entire life, and who is not Eric's child. Based upon these findings, the juvenile court issued an order terminating Eric's parental rights. Eric now appeals.

II.
[¶ 19] Under N.D.C.C. § 27-20-44(1)(c), a court may terminate parental rights if the child is a deprived child, and the court finds "[t]he conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." "The party seeking parental termination must prove all elements by clear and convincing evidence." Interest of T.A., 2006 ND 210, ¶ 10, 722 N.W.2d 548 (quotation omitted). "Clear and convincing evidence means evidence that leads to a firm belief or conviction the allegations are true." Interest of D.M., 2007 ND 62, ¶ 7, 730 N.W.2d 604 (quotation omitted). A lower court's decision to terminate parental rights is a question of fact that this Court will not overturn unless clearly erroneous. Id. at ¶ 6. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if, on the entire record, this Court is left with a *19 definite and firm conviction a mistake has been made. Id.
[¶ 20] In determining whether the causes and conditions of a child's deprivation are likely to continue, a court cannot rely solely upon evidence of previous deprivation. Interest of B.N., 2003 ND 68, ¶ 22, 660 N.W.2d 610. Rather, "[t]here must be additional prognostic evidence to reasonably predict the deprivation will continue or be unremedied." Id. Prognostic evidence may include a parent's cooperation with social services, as well as the parent's background. T.A., 2006 ND 210, ¶ 16, 722 N.W.2d 548. A "lack of parental cooperation is indicative of the likelihood deprivation will continue." Id. A parent's incarceration may also qualify as "prognostic evidence that a parent's current inability to properly care for the child will continue long enough to render improbable the successful assimilation of the child into a family if the parent's rights are not terminated." Id. (quoting Interest of T.F., 2004 ND 126, ¶ 12, 681 N.W.2d 786).
[¶ 21] Eric does not dispute David is a deprived child as defined by N.D.C.C. § 27-20-02(8). However, Eric argues the juvenile court erred by finding clear and convincing evidence establishes David was likely to continue to be deprived and that such continued deprivation was likely to result in serious physical, mental, moral, or emotional harm to David. Eric claims he never received a genuine opportunity to develop a relationship with David, and he has completed classes and treatment programs to ensure he can provide David with a satisfactory home environment upon his release from jail. Eric also argues the juvenile court was clearly erroneous to find he committed a "felony level violent crime" because, while he was charged with felony aggravated assault, he entered an Alford plea to misdemeanor assault. Therefore, Eric argues this Court should reverse the juvenile court's order terminating his parental rights.
[¶ 22] We hold the juvenile court's finding that the causes and conditions of David's deprivation are likely to continue was not clearly erroneous. The evidence establishes Eric repeatedly failed to cooperate with social services from the time David was removed from the guardian's care until the termination hearing. Eric failed to provide social services with updated addresses to ensure he received notices of permanency planning meetings. He failed to attend numerous meetings or fully participate in the permanency planning process. Despite having ample time to do so, Eric did not complete drug and alcohol or parental capacity evaluations in the manner requested by social services. Eric's lack of cooperation with social services constitutes prognostic evidence that David's deprivation is likely to continue. See Interest of E.G., 2006 ND 126, ¶ 10, 716 N.W.2d 469.
[¶ 23] Evidence of Eric's drug use also supports the juvenile court's finding that the causes and conditions of David's deprivation are likely to continue. Both times social services tested Eric for drugs, he tested positive for marijuana. During his testimony, Eric acknowledged a history of drug and alcohol abuse. While Eric also testified he has completed addiction counseling courses while incarcerated, he did not demonstrate an ability to abstain from drugs and alcohol while living outside a correctional center. Therefore, evidence of Eric's drug use supports the juvenile court's finding that David's deprivation is likely to continue. See Interest of B.J.K., 2005 ND 138, ¶ 12, 701 N.W.2d 924 ("This Court has affirmed juvenile court judgments terminating parental rights when parents were using drugs and showed little or no signs of improving.").
*20 [¶ 24] The juvenile court's finding is also supported by evidence of Eric's criminal history. Eric testified he has been charged with more than ten crimes, several of which were felonies. Eric stated he has been in and out of jail several times over the past decade. Since learning about David in 2006, Eric has been incarcerated twice, including at the time of the termination hearing. This evidence demonstrates a pattern of criminal behavior and incarceration that continued after Eric learned about David. As a result, the juvenile court was not clearly erroneous to find the causes and conditions of David's deprivation were likely to continue based in part upon this evidence. We also note the juvenile court's finding that Eric "has been convicted of a felony level violent crime" was not clearly erroneous. The State charged Eric with felony aggravated assault in February 2009, and he entered an Alford plea to misdemeanor assault pursuant to a plea bargain. Therefore, the conduct underlying Eric's plea was a "felony level" crime, although he actually pled to a lesser crime. While the juvenile court's language provides an incomplete picture, the finding is supported by evidence and not clearly erroneous.
[¶ 25] Finally, the evidence established Eric did not take advantage of the opportunity to develop a genuine relationship with David after first learning about the child in 2006. In the intervening years, Eric participated in just five supervised visitations with David and failed to attend several others. Eric only telephoned David a single time, despite having no limitation on telephone contact. This evidence also supports the juvenile court's finding that the causes and conditions of David's deprivation were likely to continue due to Eric's inability to provide adequate care.
[¶ 26] The juvenile court's finding that the causes and conditions of David's deprivation will probably cause him to suffer serious physical, mental, moral, or emotional harm is not clearly erroneous. Similar to whether the causes and conditions of a child's deprivation are likely to continue, whether a child is likely to suffer serious physical, mental, moral, or emotional harm may be demonstrated through prognostic evidence. B.N., 2003 ND 68, ¶ 30, 660 N.W.2d 610. The juvenile court found David suffers from "Adjustment Disorder with Depressed Mood," and Eric's behavior would likely exacerbate this problem. Based upon evidence of Eric's criminal history, drug and alcohol use, and lack of cooperation with social services, the juvenile court's finding that Eric would probably contribute to David's mental health problems is not clearly erroneous. The juvenile court's finding that David will probably suffer serious harm is also supported by evidence regarding David's half-sister. David's half-sister is the one constant in his life. They have resided together throughout their tumultuous lives, first with their mother, then with the guardian, and now in foster care. Eric is not the father of David's half-sister. If David were reunited with Eric but separated from his half-sister, David would likely experience serious emotional harm.
[¶ 27] Eric's main argument appears to be that the juvenile court unfairly terminated his parental rights before he had a full and fair opportunity to develop a relationship with David and prove his commitment to providing David with a satisfactory home environment. However, Eric's argument is unsupported by the evidence. Since Eric first learned about David in 2006, he repeatedly made himself unavailable to care for David due to both incarceration and the failure to consistently cooperate with social services. This behavior supports the juvenile court's termination *21 order. See Interest of E.R., 2004 ND 202, ¶ 9, 688 N.W.2d 384 (citing In re C.R., 1999 ND 221, ¶ 12, 602 N.W.2d 520) ("When a parent, through voluntary actions, without reasonable justification, makes [himself] unavailable to care for and parent a young child, the child should not be expected to wait or assume the risk involved in waiting for permanency and stability in [his] life."). In addition, while Eric's claims regarding his intention to provide a stable environment for David are a positive step, Eric did not demonstrate a present or future ability to be an adequate parent. See Interest of D.D., 2006 ND 30, ¶ 26, 708 N.W.2d 900 ("It is not enough that a parent indicates a desire to improve behavior; rather, the parent must be able to demonstrate present capacity, or capacity within the near future, to be an adequate parent."). We affirm the juvenile court's order terminating Eric's parental rights.

III.
[¶ 28] We hold the juvenile court's findings that the condition and causes of David's deprivation are likely to continue, and David will probably suffer serious harm as a result, are not clearly erroneous. We affirm the juvenile court order terminating Eric's parental rights.
[¶ 29] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, and DANIEL J. CROTHERS, JJ., concur.
DALE V. SANDSTROM, J., concurs in the result.