Filed 8/17/10 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2010 ND 147

In the Interest of R.S., a Child

Jacqueline A. Gaddie,

Assistant State’s Attorney, Petitioner and Appellee

v.

A.D.S., (Mother),

J.L.P., (Father),

Grand Forks County

Social Service Center, Respondents

A.D.S., (Mother), Appellant

No. 20100036

Appeal from the Juvenile Court of Grand Forks County, Northeast Central Judicial District, the Honorable Joel D. Medd, Judge.

REVERSED.

Opinion of the Court by Kapsner, Justice.

Jacqueline A. Gaddie (appeared), Assistant State’s Attorney, and Abby Gratz (argued), appearing under the Rule on the Limited Practice of Law by Law Students, 124 South 4th Street, P.O. Box 5607, Grand Forks, ND 58206-5607, for petitioner and appellee.

Mark T. Blumer (argued), 341 Central Avenue North, Suite 3, P.O. Box 475, Valley City, ND 58072, for appellant.

Interest of R.S.

No. 20100036

Kapsner, Justice.

[¶1] A.D.S. appeals from a juvenile court order finding her child, R.S., is deprived and placing R.S. in the custody of Grand Forks County Social Services for twelve months.  We hold the juvenile court’s finding that R.S. is a deprived child is clearly erroneous because it is unsupported by evidence, and we reverse the juvenile court’s order for disposition.

I.

[¶2] R.S. was born in 2008.  On July 20, 2009, A.D.S., who was then seventeen years old, was placed in the custody of social services.  The record does not disclose the reason for the placement.  A.D.S.’s parents agreed that she and R.S. would live with A.D.S.’s father in Fargo.  On August 12, 2009, A.D.S. absented from her father’s house with R.S.  Social services did not know the location of A.D.S. and R.S. until September 3, 2009, when police found them at the home of A.D.S.’s mother’s boyfriend in East Grand Forks, Minnesota.

[¶3] Also on September 3rd, social services petitioned for temporary custody of R.S., alleging that he was deprived.  After a shelter care hearing, the juvenile court issued a temporary custody order on September 4, 2009 placing R.S. in the custody of social services for no more than sixty days.  The juvenile court also appointed Lloyd Rath as guardian ad litem.  Social services initially placed A.D.S. and R.S. in separate foster homes, but the mother and son were reunited in the same foster home within a week.

[¶4] On October 8, 2009, the State petitioned the juvenile court to find R.S. was a deprived child under N.D.C.C. § 27-20-02(8)(a) and to place R.S. under the care, custody, and control of social services.  The petition alleged R.S. was deprived because:

[A.D.S.] put herself at risk and [R.S.] at risk when she absented with him from her father’s home on August 12, 2009.  Additionally, living with her father, [A.D.S.] was cited for unruly behavior on July 25, 2009, and was placed in attendant care removing her from [R.S.].

During the Shelter Care Hearing on September 4, 2009, [A.D.S.] refused to reveal where she and [R.S.] were staying during her absence and there were concerns as to whom she was with.  During the hearing, [A.D.S.] stated that she relied on others to care for [R.S.] and that the ability of the individuals she relied on to care for [R.S.] was unknown. [A.D.S.] indicated that she wanted [R.S.] placed with his father . . . and [paternal grandmother] if she was placed in detention.  [A.D.S.] has previously stated that [R.S.’s father and grandmother] would not be appropriate caregivers for [R.S.] due to their use of drugs.  Therefore, [A.D.S.] is not making decisions in [R.S.’s] best interest.

After an extension of the order placing temporary custody of R.S. with social services, the juvenile court held an evidentiary hearing on the deprivation petition in December 2009.

[¶5] At the hearing, Jacki Lund, a licensed social worker, testified she became involved with A.D.S.’s family in June 2008, when A.D.S. was pregnant with R.S.  Lund stated social services petitioned for temporary custody of R.S. “based on the fact that I felt that [A.D.S.] had put both herself and [R.S.] into danger by absenting and we did not know where she was.”  Lund testified she believed R.S. was deprived because A.D.S.’s poor decisions negatively affect R.S.  Specifically, Lund cited A.D.S.’s failure to regularly attend school,  abide by social services’ rules, or consistently inform social services of her and R.S.’s whereabouts.  In conclusion, Lund stated:  “I’ve got a 17 year old juvenile who has a 17 month old baby.  And the 17 year old . . . is making poor choices for herself which affects [R.S.’s] future.”

[¶6] R.S.’s guardian ad litem, Rath, testified he has been involved with A.D.S.’s family since she was in eighth grade, when a deprivation petition was filed against A.D.S.’s mother.  Rath testified A.D.S. “makes pretty bad decisions for her own life that eventually [are] going to affect [R.S.’s] life . . . .”  However, Rath stated he does not believe R.S. is presently a deprived child.  Rath testified:  “I don’t think this hearing is about, I know that it’s a filed [petition] that [R.S. is] a deprived child and that [social services] want custody, I don’t think this is really about [R.S.].  I think it’s about his mother’s decisions that she makes.”

[¶7] The juvenile court found R.S. was deprived and ordered he be placed in the custody of social services for twelve months beginning September 3, 2009.  In its oral findings, the juvenile court stated:

This is a difficult case.  The Court — [A.D.S.] has made some good decisions, I think she’s been involved with the child with parenting, getting some counseling.  The issue here is is [R.S.] deprived under the statute.  And I think that’s really what we look at, what’s the statutory definition of deprived.  And the issue is whether the child’s without proper parental care and control, subsistence necessary for the child’s physical, mental, or emotional health or morals, and the deprivation is not due primarily to finances.  So it is a, it is evidence of how the child is doing but it’s also, the issue is is the parent capable of providing for their child at this time.

The evidence here is that the, that [A.D.S.] while in the custody of social services absconded and was, and had the one year old child with her at that time and the custodian, social services, didn’t know where she was, didn’t know who she was with, didn’t know what sort of care the child was receiving.  Apparently the child was doing okay, because when the, when the child was brought back into the care of social services, the child looked well.  And that’s what Mr. Rath testified to, that’s what the Guardian ad Litem, that’s what the social services worker Ms. Lund testified to, that [R.S.] looked well, he was happy, healthy, and clean and cared for.

The issue, though, is the, is [A.D.S.] capable of caring for the child at this time to provide for the child’s needs.  The testimony here is that she is with a foster family at this time and, and with the foster family the child is being taken care of and doing well.  However, there’s continued testimony today that when she’s in foster care under the control of social services that they still don’t know, you know, where she is significant periods of time.  When she’s supposed to be going to class, she’s not in class.  When she’s — they don’t know where she is.  The issue then is is that being a responsible parent.  We have an issue of a 17 year old who, the custodian, whether it’s a parent or in this case social services, needs to know what activity she’s involved with and is [R.S.] being taken care of.  So the issue at this point is, is when she’s in, when [A.D.S.’s] in the custody of social services and is in foster care and the child is in custody of social services and being placed with [A.D.S.] in foster care, whether, whether the child is without proper parental care and control of [A.D.S.].

The Court after analyzing all of this and according to the statute, the Court finds by clear and convincing evidence that, that the child is not with proper parental care and control.  Because of the situation the child is with supervision of a foster family, is with supervision of social services and even under those strict guidelines that there is still not, there’s still not ability to follow the rules.  And that’s really what this case kind of involves is, you know, following the rules, to follow the rules of being a better, of being a parent that’s capable of caring for your child.

So I believe that there’s some positive steps that have been made here.  I think the child is physically being cared for by, by foster parents and [A.D.S.] together, but I don’t believe that under the statute — I think the [State] has shown that under the statute that the, that the focus here is [A.D.S.] providing proper parental care and control.  And it’s been shown, as I said before, and I don’t want to repeat myself but it’s been shown here I believe by clear and convincing evidence that she’s not providing for proper parental care and control and doing the things she needs to do to care for the child.

The juvenile court’s written findings stated R.S. is a deprived child because of poor decisions made by A.D.S. on behalf of R.S., including her failure to inform social services of her and R.S.’s whereabouts after she left her father’s home.  The juvenile court stated there were ongoing concerns about R.S.’s care and control.

II.

[¶8] A.D.S. argues the juvenile court erred in finding R.S. is a deprived child under N.D.C.C. § 27-20-02(8)(a), which provides:

8.  “Deprived child” means a child who:

a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child’s physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child’s parents, guardian, or other custodian.

The phrase “proper parental care” refers to the minimum standard of care which the community will tolerate.  
Interest of K.R.A.G.
, 420 N.W.2d 325, 327 (N.D. 1988).  A child may be deprived even though the child has been receiving adequate care from a source other than the parent.  
Interest of T.J.O.
, 462 N.W.2d 631, 633 (N.D. 1990).

[¶9] The petitioner must establish deprivation by clear and convincing evidence.  
In re B.B.
, 2008 ND 51, ¶ 6, 746 N.W.2d 411.  “Clear and convincing evidence means evidence that leads to a firm belief or conviction the allegations are true.”  
In re A.B.
, 2009 ND 116, ¶ 16, 767 N.W.2d 817 (quoting 
Interest of M.B.
, 2006 ND 19, ¶ 13, 709 N.W.2d 11).  On review, this Court will not overturn a juvenile court’s finding that a child is deprived unless the finding is clearly erroneous.  
B.B.
, at ¶ 4.  “A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made.”  
In re T.A.
, 2006 ND 210, ¶ 11, 722 N.W.2d 548 (citation omitted).  When a party appeals a juvenile court order, we review “the files, records, and minutes or transcript of the evidence,” and we give “appreciable weight to the findings of the juvenile court.”  N.D.C.C. § 27-20-56(1).

[¶10] We hold the juvenile court erred by finding clear and convincing evidence establishes R.S. is a deprived child under N.D.C.C. § 27-20-02(8)(a), because the finding is unsupported by evidence.  In both its oral and written findings, the juvenile court stated it found R.S. is deprived because A.D.S. absented from her father’s home with R.S., and she failed to inform social services of their location.  In its oral findings, the juvenile court stated:  “We have an issue of a 17 year old who, the custodian, whether it’s a parent or in this case social services, needs to know what activity she’s involved with and is [R.S.] being taken care of.”  Similarly, in its written findings, the juvenile court stated “[t]he ongoing concern . . . was the fact that Social Services, and other responsible adults, were not aware of [R.S.] and [A.D.S.’s] whereabouts and there was ongoing concern for [R.S.’s] care and control.”

[¶11] However, no evidence indicates R.S. went without proper parental care and control during this period, nor that A.D.S.’s behavior had an adverse effect on R.S.’s physical, mental, or emotional health.  Rather, as the juvenile court stated in its oral findings, the evidence established “[R.S.] looked well, he was happy, healthy, and clean and cared for” when social services located the child and A.D.S. on September 3, 2009.  Also, at the time A.D.S. left her father’s home with R.S., there was no court order governing R.S., nor does the record include any prior order governing R.S. since he was born in 2008.  Although A.D.S. had been placed in the custody of social services, R.S. had not.

[¶12] The social worker who testified as an expert on deprivation in support of the petition outlined her evidence on deprivation:

I feel that he’s deprived because she puts him in situations that the adults in her life are not aware of.  She puts him with people that we don’t know, that we’re not familiar with.  It’s, she puts, she’s not forthcoming in where she’s going and what she’s doing and therefore we don’t know where [R.S.] is and we don’t know who he’s with and what’s taking place when she’s with him.  So I believe the deprivation comes with her poor choices for herself, therefore, it’s affecting him because if we don’t know where she is, we don’t know where he is, and we can’t keep him safe if we can’t keep her safe.

[¶13] Although expressing genuine concern for lack of knowledge, the social worker also acknowledged no basis to claim any harm to the child:

Q ([A.D.S.’s attorney] continuing) You testified earlier that you’d been involved with the families since at least since [R.S.] was born, correct?

A June of 2008.

Q Okay.  Now you’d agree with me that [A.D.S.] has been the primary caregiver for [R.S.] since he was born?

A Yes.  Well, yes, in her mother’s home. [The grandmother] was also — 

Q [A.D.S.] lived at [the grandmother’s] home?

A Right.

Q But [A.D.S.] was still the mother to [R.S.] and she cared for [R.S.]?

A Yes.

Q Okay.  During — let’s start with during the time [R.S.] was born and when you received custody of [A.D.S.], did you ever have any concerns that [R.S.] wasn’t being fed?

A No.

Q Did you ever have any concerns that the home was dirty?

A Yes.

Q That was [the grandmother’s] home?

A Yes.

Q Okay.  Did it rise to the level where you thought that [R.S.] was in trouble for being in that home?

A Well, I will tell you that when I asked to see [R.S.’s] room so I could see where [R.S.] laid his head at night, I was refused.  So I, I have no idea if [R.S.’s] room was appropriate and safe for him or not because I was not allowed access to see where he laid his head.

Q Okay.  So you don’t know what his room looked like?

A I do not, no.

Q You can’t say that it was dirty?

A I can’t because they wouldn’t let me in.

Q Okay.  Did you do anything at that point to get some other authority to go in there and look?

A No, I did not.

Q So I assume that you weren’t that concerned about it at that point?  Because you didn’t take any further steps.

A I took no further steps, no.

Q During that time period has there ever been any concern that [R.S.] wasn’t developing physically the way he should be?

A No.

Q Was there any concern that he wasn’t developing mentally the way he should be?

A No.

Q Okay.  Now during — once you received custody of [A.D.S.] on July 20th, 2009, from that point up until the time [A.D.S.] left her father’s home, same questions, did you have any concern about [R.S.] not being fed?

A No.

Q Or clothed?

A No.

Q Or cared for?

A No.

Q Any concerns about the quality of the house he was in — 

A No.

Q — as far as it being dirty?  No concerns about him developing physically and mentally the way he should?

A No.

Q Can you tell me specifically now after [A.D.S.] left her father’s home, is there a specific, a fact that gives you concern that [R.S.] was in some sort of physical or emotional danger?

A I had no information whatsoever so I have no fact that he was in danger.  It’s based on the fact that we have custody of a 17 year old girl who took her little one year old with her.  We had no idea where they were, have prior history of [A.D.S.] being with people that are not — 

Q Right, and I’m going to get to that in a second.

A Okay.

Q But my question is simply you don’t have any fact that you can point to that you can say that when she left, that’s why it was concern because she was gone.  I mean your concern is that you didn’t know where she was basically?

A I think the only fact is that we had an absenting 17 year old with a one year old.  That was of concern.

Q Right.  And you don’t have any witnesses or anybody who can say when she left [R.S.] wasn’t cared for?

A No, because I didn’t, I had no contact so no.

Q Okay.  And still to this day you still don’t know where she was or — let me reask that.  Still to this day you still don’t have any witness or anything that has come forward that says that [R.S.] wasn’t properly cared for while [A.D.S.] was gone with him?

A No witnesses have come forward to tell me that, no.

Q Okay.  And no other facts, other than the fact, I understand you don’t know where she went but other than that fact you have no other facts that would lead you to the conclusion that [R.S.] wasn’t cared for?

A No.

Q Since [A.D.S.] and [R.S.] were placed together in the foster home with [foster mother], is that correct?

A Yes.

Q [Foster mother], have you, has there been any problems with [R.S.] there?

A No.

[¶14] The social worker denied having concerns about A.D.S. engaging in risky behaviors while R.S. was in her care:

Q Okay.  Now your concern with [A.D.S.] going places where you don’t know where she is, she’s not taking [R.S.] with her when she’s doing that?

A Yes, she is.

Q Every time?

A I can’t tell you it’s every time but she takes him most of the time when she leaves the home.

Q Okay.  And when she does that, do you have somebody who has told you that she’s gone to do something that is risky towards [R.S.]?  I mean do you have concerns that she’s going out drinking, for example, or what is your concern that she’s doing?

A My concern is that I don’t know what she’s doing.  I don’t, I have not had any evidence that she’s been drinking or using drugs or anything like that.  Honestly, I haven’t had a concern with that.

[¶15] The record is devoid of any evidence of negative impact on the child.  Evidence of deprivation is based entirely on speculation of the effect A.D.S.’s irresponsible decision-making will eventually have on the child.

[¶16] In the absence of a different legal standard for the children of minors who are themselves the subject of a court order, the juvenile court erred by finding clear and convincing evidence established R.S. is a deprived child.  Rather, the evidence established social services feared A.D.S.’s behavior and decision-making would ultimately deprive R.S. of proper parental care and control.  However, N.D.C.C. § 27-20-02(8)(a) does not provide a child is deprived based upon a future possibility of harm where the child has not actually lacked proper parental care or control.  As R.S.’s guardian ad litem correctly recognized, the evidentiary hearing focused upon A.D.S.’s decision-making rather than whether those decisions were presently depriving R.S. of proper parental care and control.

III.

[¶17] We hold the juvenile court’s finding that R.S. is a deprived child is clearly erroneous because it is unsupported by evidence, and we reverse the juvenile court’s order for disposition.

[¶18] Carol Ronning Kapsner

Daniel J. Crothers

Gerald W. VandeWalle, C.J.

Maring, Justice, dissenting.

[¶19] Because I believe there is evidence in this record to support the juvenile court’s finding that R.S. is a deprived child and I am not left with a definite and firm conviction the juvenile court made a mistake in finding R.S. is a deprived child, I respectfully dissent.

[¶20] Under N.D.C.C. § 27-20-02(8)(a), a “[d]eprived child” means a child “without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child’s physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child’s parents, guardian, or other custodian.”

[¶21] Proper parental control refers to the minimum standard of care which the community will tolerate.  
In Interest of K.R.A.G.
, 420 N.W.2d 325, 327 (N.D. 1988).  We have said a pattern of parental conduct can form a basis for a reasonable predication of future behavior.  
In re B.B.
, 2008 ND 51, ¶ 9, 746 N.W.2d 411.  A child may be deprived even though the child has been receiving adequate foster or other proper care from a source other than the parent.  
In Interest of T.J.O.
, 462 N.W.2d 631, 633 (N.D. 1990). 

[¶22] Deprivation must be established by clear and convincing evidence.  
In re B.B.
, 2008 ND 51, ¶ 6, 746 N.W.2d 411.  A juvenile court’s finding that a child is deprived is a finding of fact governed by the clearly erroneous standard of review in N.D.R.Civ.P. 52(a).  
See
 
In re B.B.
, at ¶ 4.  “‘A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made.’”  
In re T.A.
, 2006 ND 210, ¶ 11, 722 N.W.2d 548 (citation omitted).  A trial court’s choice between two permissible views of the evidence is not clearly erroneous, and simply because this Court may have viewed the evidence differently does not entitle this Court to reverse a trial court.  
Brandt v. Somerville
, 2005 ND 35, ¶ 12, 692 N.W.2d 144.  Under N.D.R.Civ.P. 52(a), this Court does not reweigh conflicts in the evidence, and we give due regard to the trial court’s opportunity to judge the credibility of the witnesses.  
Brandt
, at ¶ 12.  When a party appeals a juvenile court order, we review “the files, records, and minutes or transcript of the evidence” and we give “appreciable weight to the findings of the juvenile court.”  N.D.C.C. § 27-20-56(1).

[¶23] On July 20, 2009, Grand Forks County Social Services received custody of A.D.S., who was seventeen years old.  A.D.S.’s parents agreed that A.D.S. and her one-year old child, R.S., would live with A.D.S.’s father in Fargo, but she ran away from her father’s house with R.S. on August 12, 2009, and their whereabouts were not known until police located them approximately three weeks later on September 3, 2009, in East Grand Forks at the home of A.D.S.’s mother’s boyfriend.

[¶24] A licensed Grand Forks County social worker, Jacki Lund, testified that A.D.S.’s mother denied knowing the whereabouts of A.D.S. and R.S. during that time.  Lund also testified that A.D.S. had difficulty following rules and respecting the county’s position as her custodian.  Lund testified that after Grand Forks County Social Services had custody of both A.D.S. and R.S., A.D.S. on numerous occasions had received permission to go some place and she was not where she said she would be, that A.D.S. failed to go to school and no one knew where she was when she was not at school, and that social services had implemented a visitation plan for R.S. to see his father but A.D.S. ignored the visitation plan and took R.S. to his father’s mother’s house without notifying social services.  Lund explained there was “a lack of, of follow-through with rules both in the foster home and from case management through me,” and A.D.S. had a “lack of 
understanding how her behaviors are impacting R.[S.]”  Lund opined that R.S. was deprived: 

The basis is that I’ve got a 17 year old juvenile who has a 17 month old baby.  And the 17 year old is making, A.[D.S.], is making poor choices for herself which affects R.[S.’s] future.  And I believe that based on her decisions and how it affects R.[S.] that he continuance [sic] to be deprived.

. . . 

I feel that he’s deprived because she puts him in situations that the adults in her life are not aware of.  She puts him with people that we don’t know, that we’re not familiar with.  It’s, she puts, she’s not forthcoming in where she’s going and what she’s doing and therefore we don’t know where R.[S.] is and we don’t know who he’s with and what’s taking place when she’s with him.  So I believe the deprivation comes with her poor choices for herself, therefore, it’s affecting him because if we don’t know where she is, we don’t know where he is, and we can’t keep him safe if we can’t keep her safe. 

[¶25] R.S.’s guardian ad litem, Lloyd Rath, testified that A.D.S. makes bad decisions in her life that affect R.S. but as long as A.D.S. was in foster care, he was not concerned about R.S.  Rath testified, however, that A.D.S. would turn 18 in May 2010 and she thereafter would not be in foster care.  Rath testified that A.D.S. told him that she had been staying with her mother at her mother’s boyfriend’s house after she ran away from her father’s home with R.S.  Rath testified that he was always concerned when A.D.S. was with her mother.  A.D.S. and R.S. were initially living with A.D.S.’s mother when Grand Forks County Social Services received custody of A.D.S. on July 20, 2009, and A.D.S.’s parents agreed that she would live with her father in Fargo.  There was evidence that social services first contact with A.D.S. was through services provided to her mother and that there had been a deprivation finding against A.D.S.’s mother.  There was also evidence that A.D.S. preferred to live with her mother because she had not had to follow rules while living with her mother.  This record also includes Rath’s report, which provides:

[A.D.S.] said that she has no intention of running from the foster home.  She said it is OK in the foster home but it is not like being with her mother.  [A.D.S.] wants everyone to know that she is a good mom.  I was able to talk with [A.D.S.] that the concern is not about her being a good mom it is about the choices she makes that puts [R.S.] at risk.  At this time both [A.D.S.] and [R.S.] are doing good. [A.D.S.] recently got in trouble in the foster home as she was not at the place she told the foster mother she would be at.  She went to a friend[’]s home, left there early and went over to [R.S.’s] father[’]s house.  She is currently grounded and feels that is fair.

[A.D.S.’s] concern is she does not wanted [sic] GFCSS to have a one year custody order. She could support an order that only goes till May 2010 as that is when she will be 18 and can leave foster care. . . .

[¶26] There was evidence that A.D.S., while in the custody of Grand Forks County Social Services, ran away from her father’s home with R.S. and their location was not known for three weeks.  During that time, A.D.S. allowed other individuals to care for R.S. and A.D.S. lacked knowledge about the parenting skills of those individuals.  Lund testified social services had information that A.D.S. in the past had been with people that were not the best people for R.S. to be around.   There was  evidence that A.D.S. had obtained a restraining order against the mother of R.S.’s father, which Lund believed necessitated supervised visitation for R.S.’s father, and that while A.D.S. was in foster care with R.S., A.D.S. took R.S. to the home of the father’s mother in contravention of the visitation plan that Lund had developed for R.S.  Lund testified the mother of R.S.’s father had recently been charged with possession of marijuana.  Further, when A.D.S. failed to attend classes at school, no one knew where she was, and she did not return to the foster home to take care of R.S. 

[¶27] In reviewing this record, I am mindful that A.D.S. herself was in the custody and control of Grand Forks County Social Services after July 20, 2009, and that R.S. was in the temporary custody and control of Grand Forks County Social Services for sixty days from September 3, 2009.  There is evidence that while A.D.S. was in the custody of social services, she placed R.S. at risk when she left her father’s home with R.S. for three weeks without informing Grand Forks County Social Services of their whereabouts, that A.D.S. relied on individuals with unknown ability to care for R.S. during that time, and that A.D.S. took R.S. to the home of his father’s mother in contravention of a visitation plan imposed by Grand Forks County Social Services when R.S. was in the custody of Grand Forks County Social Services.  The evidence in this record shows that while A.D.S. was in the custody of Grand Forks County Social Services, she has demonstrated a pattern of inadequate decision making on behalf of R.S. and that her pattern of decision making has placed R.S. at risk.  

[¶28] Although R.S. may not have suffered any tangible harm while he has been in foster care, there is evidence in this record that A.D.S.’s pattern of decision making has subjected him to a risk of harm.  R.S. may not have suffered any tangible harm yet, but the evidence establishes a risk of harm and a pattern of inappropriate decision making and failure to conform to established rules and I do not believe we must wait for some tangible harm to R.S.  R.S. has been receiving adequate foster care primarily from a source other than A.D.S., but A.D.S.’s pattern of poor decision making and its affect on R.S. can form a basis for a reasonable prediction of future behavior.  

[¶29] I believe there is evidence that A.D.S.’s pattern of conduct while herself in custody of Grand Forks County Social service is below the minimum standard of care for which the community will tolerate, which, in turn, constitutes evidence that A.D.S. failed to provide proper parental control or care for R.S.  Although I agree with the juvenile court that this is a “difficult case” and I may have reached a different result if I had been the juvenile court, I am convinced there is evidence in this record to support the juvenile court’s finding that A.D.S. was not providing proper parental control or care for R.S.  On this record, I cannot conclude, as a matter of law, that the State has not established R.S. was a deprived child.  Giving due regard to the juvenile court’s opportunity to assess the credibility of the witnesses, I am not left with a definite and firm conviction the juvenile court made a mistake in deciding R.S. was a deprived child under N.D.C.C. § 27-20-02(8)(a).  

[¶30] I would affirm the juvenile court order.  

[¶31] Mary Muehlen Maring

Dale V. Sandstrom