Filed 8/17/10 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2010 ND 157

In the Interest of M.G., a Child

Stuart Larson, Traill County States Attorney, Petitioner and Appellee

v.

S.M., Respondent and Appellant

Director, Traill County Social Services, T.G., M.G., 

and Cynthia Kesler, Lay Guardian ad Litem, Respondents

No. 20100207

Appeal from the District Court of Traill County, East Central Judicial District, the Honorable Steven L. Marquart, Judge.

AFFIRMED.

Opinion of the Court by Sandstrom, Justice.

Stuart A. Larson, State’s Attorney, P.O. Box 847, Hillsboro, N.D. 58045-

0847, for petitioner and appellee.

Douglas W. Nesheim, 15 9th Street South, Fargo, N.D. 58103-1830, for respondent and appellant.

Interest of M.G.

No. 20100207

Sandstrom, Justice.

[¶1] S.M. appeals from a district court order adopting a judicial referee’s findings and decision terminating parental rights to her son, M.G.  We conclude the court’s findings that the conditions and causes of M.G.’s deprivation were likely to continue, that M.G. will probably suffer serious mental or emotional harm absent termination of parental rights, and that reasonable efforts were made to prevent the continued placement of the child outside the parental home are supported by clear and convincing evidence and are not clearly erroneous.  We affirm.

I

[¶2] M.G. was born in November 1999 and is currently ten years old.  S.M. is his mother and T.G. is his father.  S.M. and T.G. were living together when M.G. was born.  They eventually married and T.G. adopted M.G.  Another son was born in 2001.  In September 2002, T.G. left the family home in Fargo, and the couple later divorced. 

[¶3] S.M. began using methamphetamine and other illegal drugs in 2004.  After several investigations by social services regarding general health and safety concerns for the children, S.M. agreed to have the children placed with T.G.  A few months later M.G. was placed in the care of S.M.’s mother, but M.G. was removed from her care in August 2005 and placed in foster care.  S.M. then met with a social worker to create a case plan and work toward reunification with M.G., but little progress was made because S.M. attended only four of the regularly scheduled visits.  In December 2005, M.G. was found to be deprived, and S.M. agreed to have M.G. placed with T.G., T.G.’s current wife, and their children.

[¶4] S.M. continued using methamphetamine and other illegal drugs until March 2006, when she was indicted for conspiracy to deliver or distribute methamphetamine.  S.M. pled guilty to the federal criminal charge in February 2007, and she was sentenced to prison for 48 months followed by five years of probation.  S.M. served her sentence in federal prison facilities in Illinois and Arizona.  During her incarceration, S.M. had no in-person contact with M.G., but did write letters to him.  S.M.’s last phone conversation with M.G. while incarcerated occurred in August 2007.

[¶5] While living with T.G. from early 2006 through May 2008, M.G. began exhibiting signs of abnormal behavior.  M.G. began hoarding food, urinating on the home carpeting, hitting and burning the other children, displaying sexualized behaviors, harming animals, threatening family members, and destroying the family’s property.  In May 2008, M.G. was removed from T.G.’s home and placed in the custody of Traill County Social Services.  In July 2008, M.G. was again adjudicated deprived and was placed in a therapeutic foster home for special needs children where his abnormal behavior stabilized.  M.G. has been diagnosed with mood disorder NOS, disruptive disorder NOS, and possible post traumatic stress disorder, and he receives medication for those conditions.  M.G. has had two placements in a psychiatric facility.  A petition for termination of T.G. and S.M.’s parental rights to M.G. was filed in February 2009.

[¶6] In April 2009, S.M. was released from prison and placed in a transitional residential treatment facility in Fargo.  While incarcerated, S.M. earned her GED, addressed her drug addiction issues, took parenting classes and other training courses, and became a certified welder.  S.M. obtained two jobs in Fargo and had plans to relocate to an apartment where she could care for M.G.  Beginning in March 2009, M.G.’s behaviors became less stable.  M.G.’s therapist believed the change in his behavior was attributable to M.G.’s stress about the pending court proceedings, his fear of leaving the foster home, and the resumption of contact with S.M.  After receiving an “amends letter” from S.M., M.G. agreed to meet with S.M. on the condition that his foster parents would also be present.  

[¶7] T.G. acknowledged he lacked the ability to provide the high level of care required for M.G. and consented to termination of his parental rights.  T.G.’s consent was conditioned on the termination of S.M.’s parental rights.  T.G., S.M., a friend of S.M.’s, and several social service workers who had been involved with M.G. testified at the hearing before a judicial referee.  Following the hearing, the referee terminated T.G. and S.M.’s parental rights.  The district court, on request for review, determined the referee’s “findings in this case do not provide clear and convincing evidence that the conditions and causes of [M.G.’s] deprivation are likely to continue or will not be remedied,” and remanded to the referee for additional findings on the petition for termination.  The referee prepared additional findings and once again ordered termination of T.G.’s and S.M.’s parental rights.  On request for review, the district court adopted the referee’s amended findings and order. 

[¶8] The juvenile court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27-20-03(1)(b).  The district court judge had jurisdiction under N.D. Sup. Ct. Admin. R. 13(11) to review the referee’s findings and order.  S.M.’s notice of appeal was timely under N.D.C.C. § 27-20-56(1).  This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 27-20-56(1).

II

[¶9] S.M. argues the district court erred in terminating her parental rights to M.G.

[¶10] In 
Interest of D.H.
, 2010 ND 103, ¶ 19, 783 N.W.2d 12, we recently outlined this Court’s standard of review in parental rights termination cases:

Under N.D.C.C. § 27-20-44(1)(c), a court may terminate parental rights if the child is a deprived child, and the court finds “[t]he conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm.” “The party seeking parental termination must prove all elements by clear and convincing evidence.”  
Interest of T.A.
, 2006 ND 210, ¶ 10, 722 N.W.2d 548 (quotation omitted).  “Clear and convincing evidence means evidence that leads to a firm belief or conviction the allegations are true.”  
Interest of D.M.
, 2007 ND 62, ¶ 7, 730 N.W.2d 604 (quotation omitted).  A lower court’s decision to terminate parental rights is a question of fact that this Court will not overturn unless clearly erroneous.  
Id.
 at  ¶ 6.  A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or if, on the entire record, this Court is left with a definite and firm conviction a mistake has been made.  
Id.

A 

[¶11] S.M. does not dispute that M.G. is a deprived child, but argues there was not clear and convincing evidence to support findings that the condition and causes of the deprivation are likely to continue or will not be remedied, and that, absent termination of parental rights, the child will likely suffer serious harm.  

[¶12] Although past deprivation alone is not sufficient to prove deprivation will continue, we have recognized that any prediction of the future requires some reflection on the party’s past conduct.  
Interest of T.A.
, 2006 ND 210, ¶ 15, 722 N.W.2d 548.  While incarceration alone does not constitute continued deprivation, 
id.
 at ¶ 16, the harm a parent’s incarceration may cause a child “may be established by prognostic evidence that a parent’s current inability to properly care for the child will continue long enough to render improbable the successful assimilation of the child into a family if the parent’s rights are not terminated.”  
Interest of T.F.
, 2004 ND 126, ¶ 12, 681 N.W.2d 786.  “A parent’s lack of cooperation in parenting classes or with social workers is probative, as is the parent’s background.”  
Interest of E.G.
, 2006 ND 126, ¶ 10, 716 N.W.2d 469.  Prognostic evidence may also be found in “reports and opinions of the professionals involved.”  
Interest of D.Q.
, 2002 ND 188, ¶ 21, 653 N.W.2d 713.

[¶13] There is evidence that before her incarceration S.M. failed to cooperate with social services in an effort to keep M.G. in her home.  Since leaving prison, S.M. has cooperated with social services.  A guardian ad litem reported, however, that S.M. does not have “an accurate understanding of [M.G.’s] needs at this time.”  A licensed social worker noted that S.M. questioned the need for M.G. to be hospitalized in a psychiatric facility, and it had to be explained to S.M. that M.G.’s “hospitalization was not rooted in sole misbehavior but rather a combination of mental health and behavioral issues,” and that “the medical team recommended the hospitalization as a necessary medical intervention.”  S.M. testified at the hearing that M.G. was in need of “counseling with me along” and “school activities” at the present time, and predicted she would be ready to care for M.G. in six to twelve months.  A social services caseworker estimated it would take from one to three years before S.M. could care for M.G.  A therapist and the caseworker from social services testified the causes of deprivation would likely continue and M.G. would probably suffer serious emotional harm if he were not placed in a stable environment.  The judicial referee found S.M. “demonstrated no knowledge or insight into [M.G.’s] special needs” and “there is no history of [S.M.] being capable of providing the extra care and services required for [M.G.’s] well being.”  

[¶14] In finding the causes of deprivation would likely continue and M.G. would probably suffer serious harm absent termination, the referee explained her reasoning in detail:

a. [S.M.] had untreated chemical dependency and methamphetamine usage during the years 2004 through 2006, which adversely impacted her ability to parent.  During this period of time [S.M.] also tried cocaine, marijuana and ecstasy. [S.M.] failed to provide appropriate care for [M.G.] during this period of time.

b. While being in a highly structured and controlled environment, [S.M.] has remained drug free since March 2006.  Although there is some evidence of efforts by [S.M.] to deal with her addiction and learn appropriate parenting behavior during her incarceration, she has not demonstrated success outside this highly structured and controlled environment.

c. There is a history of involvement of this family with social services, during the period 2004 through 2005, regarding the condition of the home, supervision of the child and general health and safety concerns.  As a result of these investigations and social services’ intervention, [S.M.] voluntarily agreed to have [M.G.] placed with [T.G.].

. . . .

e. [M.G.] has continuously been in foster care since May 21, 2008.  [S.M.] and [M.G.] have not had a relationship or contact for approximately five (5) years, except for letters and a few telephone calls. [M.G.] has not felt comfortable with [S.M.] and has refused to see or even talk with her. [M.G.] has agreed to meet [S.M.] on the condition that his foster parents are also present.

f. [S.M.] has been unavailable to actively parent [M.G.] due to her voluntary actions, which have included possessing controlled substances, using controlled substances, failing to maintain contact with the child and engaging in criminal acts which resulted in incarceration.

g. The exact period of time [M.G.] would need to continue in foster care while [S.M.] completes her obligation on her criminal conviction, establishes a home and a stable life in order to provide for [M.G.] cannot be predicted at this time, but the Court finds the evidence clearly demonstrates it will be too long to require [M.G.] to wait, taking into account the time [M.G.] has already been in foster care.

 

At trial, [S.M.] testified she would be ready to care for [M.G.] in 
six to twelve months
. . . . Based on reports and opinions of the professionals involved, [S.M.] has made some progress but is not ready to care for [M.G.].  If [S.M.] could attain stability as well as acquire the skills necessary to care for [M.G.], the facts support the conclusion that it would require significant time, further delaying permanency for [M.G.].

 

While [S.M.] is eager to reconnect with [M.G.], he is very cautious and frightened about any contact with this mother. . . .  [M.G.] has developed strong, emotional attachments with his foster parents.  In contrast, the current relationship between [M.G.] and [S.M.] is very tenuous and he is exhibiting trauma at the mere prospect of seeing his mother. It is apparent that significant time and treatment would be required in order to establish any relationship between mother and son.

[¶15] “Long-term and intensive treatment for a parent is not required if it cannot be successfully undertaken in time to enable the children to be returned to the parental home without causing severe dislocation from emotional attachments formed during long-term foster care.”  
Interest of N.H.
, 2001 ND 143, ¶ 9, 632 N.W.2d 451.  Moreover, courts cannot allow a child to “remain in this indeterminative status midway between foster care and the obvious need for permanent placement.”  
Interest of A.B.
, 2009 ND 116, ¶ 23, 767 N.W.2d 817 (internal quotation and citation omitted).  We conclude the findings that the causes of M.G.’s deprivation would likely continue and that he would probably suffer serious harm absent termination are supported by clear and convincing evidence and are not clearly erroneous.

B

[¶16] S.M. also argues there was not clear and convincing evidence to support a finding that reasonable efforts were made to prevent the continued placement of M.G. outside the parental home.

[¶17] Absent aggravated or other specified circumstances, reasonable efforts must be made to preserve and to reunify families.  N.D.C.C. § 27-20-32.2(2); 
Interest of E.R.
, 2004 ND 202, ¶ 12, 688 N.W.2d 384.  The judicial referee found “[r]easonable efforts were made to prevent the removal of [M.G.] from the home but were unsuccessful.”  The evidence in the record establishes that attempts were made to reunify S.M. and M.G. before her incarceration, but S.M. failed to cooperate with the case plan and reunification plan set forth by social services.  S.M., “by her voluntary conduct in breaking the law resulting in her incarceration, derailed that assistance.”  
E.R.
, at ¶ 13.  S.M. argues social services should have facilitated contact between M.G. and S.M. while she was incarcerated in out-of-state prisons.  During this time, however, social services was working extensively in an effort to have M.G. remain in T.G.’s home.  Section 27-20-32.2(2), N.D.C.C., requires “reasonable efforts,” not “extraordinary efforts.”  Social services was not required to facilitate contact between M.G. and S.M. during her incarceration when she had failed to take advantage of any of the reunification efforts offered by social services before she went to prison.

[¶18] We conclude the finding that reasonable efforts were made by social services to reunify the family is supported by clear and convincing evidence and is not clearly erroneous.

III

[¶19] We conclude the district court did not err in terminating S.M.’s parental rights to M.G.  Accordingly, the order is affirmed.

[¶20] Dale V. Sandstrom

Daniel J. Crothers

Mary Muehlen Maring

Carol Ronning Kapsner

Gerald W. VandeWalle, C.J.