2014 ND 28

In the Interest of R.L.-P., a Child.

State of North Dakota, Petitioner and Appellee

v.

R.L.-P., child; S.L.-C., Mother; N.P., Father; Barbara Oliger, Guardian Ad Litem, Respondents.

S.L.-C., Mother and N.P., Father, Appellants.

In the Interest of L.L.-P., a Child.

State of North Dakota, Petitioner and Appellee

v.

L.L.-P., child; S.L.-C., Mother; N.P., Father; Barbara Oliger, Guardian Ad Litem, Respondents.

S.L.-C., Mother and N.P., Father, Appellants.

In the Interest of A.L.-P., a Child.

State of North Dakota, Petitioner and Appellee

v.

A.L.-P., child; S.L.-C., Mother; N.P., Father; Barbara Oliger, Guardian Ad Litem, Respondents.

S.L.-C., Mother and N.P., Father, Appellants.

In the Interest of A.L.-P., a Child.

State of North Dakota, Petitioner and Appellee

v.

A.L.-P., child; S.L.-C., Mother; N.P., Father; Barbara Oliger, Guardian Ad Litem, Respondents.

N.P., Father, Appellant.

In the Interest of R.L.-P., a Child.

State of North Dakota, Petitioner and Appellee

v.

R.L.-P., Child; S.L.-C., Mother; N.P., Father; Barbara Oliger, Guardian

Ad Litem, Respondents.

N.P., Father, Appellant.

In the Interest of L.L.-P., a Child.

State of North Dakota, Petitioner
and Appellee

v.

L.L.-P., Child;  S.L.-C., Mother;  N.P.,
Father;  Barbara Oliger, Guardian
Ad Litem, Respondents.

N.P., Father, Appellant.

Nos. 20130382, 20130383, 20130384,
20130385, 20130386, 20130388.

Supreme Court of North Dakota.

Feb. 13, 2014.

Britta K. Demello Rice, Assistant State's Attorney, Burleigh County State's Attorney's Office, Bismarck, N.D., for petitioner and appellee.

Thomas M. Jackson, Bismarck, N.D., for respondent and appellant S.L.-C.

Matthew J. Arthurs, Bismarck–Mandan Public Defender Office, Bismarck, N.D., for respondent and appellant N.P.

SANDSTROM, Justice.

[¶ 1] S.L.-C., the mother, and N.P., the father, appeal separately from a juvenile court order terminating their parental rights to their three children. We conclude the court's findings that the children are deprived and have been in foster care more than 450 out of the previous 660

nights are supported by the evidence and are not clearly erroneous. We affirm.

## I

[¶ 2] S.L.-C. and N.P. are the parents of R.L.-P., born in 2004; L.L.-P., born in 2006; and A.L.-P., born in 2007. The parents are divorced, and the mother was awarded primary residential responsibility of the children. In January 2011, the children were taken from the mother's home into shelter care. In an affidavit, a social worker described the mother's home:

A welfare check was conducted on January 4, 2011 at the residence of [the mother], which resulted in [the mother's] arrest for Child Abuse and Neglect. Inside [the mother's] home, it was difficult to walk around due to the amount of debris on the floor including nails, clothing, toys, dishes with food, tools, and other misc items. The toilet was plugged and appeared to have been in that condition for a period of time; there was no tank cover. The bathroom was difficult to enter due to debris all over the hallway. There were no sheets on the mattresses on the floor in the children's bedroom upstairs. Per the officer's report, there was a broken mirror, broken glass, open scissors, knives that the children had access to as well as old food scattered across the floor and in the doorways. . . . At the time of the welfare check, [the mother] tested positive for Amphetamines, Methamphetamines, and THC. The oldest child had missed two days of school; [the mother] reportedly had called the school stating that he was sick. At the time of removal, he didn't appear to be sick. Following the removal, the children reported that the only thing they ate all day was bananas. The children were dirty, they smelled, and their clothing was filthy. The children were dressed improperly for the season. During the welfare check, one of the officers asked the children to put their shoes on to protect them from the debris on the floor.

[¶ 3] After a shelter care hearing, a judicial referee found there was cause to believe the children were deprived and continued shelter care of the children was required. Deprivation proceedings for the three children have been ongoing since January 2011.

[¶ 4] In November 2012, the state petitioned to terminate the parents' parental rights to the three children. In May 2013, a trial was held on the termination petitions and to determine a permanent plan for the children.

[¶ 5] After trial, a judicial referee found the mother has been the parent with primary residential responsibility since the parents divorced. The referee found that "[a]lthough this family had come to the attention of social services before, primarily because of domestic violence occasioned by the respondent father, it was [the mother's] illegal drug use that caused [the children] to be placed into foster care on 4 January 2011." The referee found the mother is apparently sober at this time, but her sobriety has been maintained under very controlled circumstances, and it is uncertain whether she will be able to maintain sobriety. The referee also found the mother has not had any personal visits with her children for a number of months and the oldest child declines to have telephone contact with her at this time.

[¶ 6] The referee found the father has had, and continues to have, significant mental health problems that interfere with his ability to parent. The referee also found the father has shown some initial interest in treatment programs but has not made much progress addressing these problems, and it is unclear whether he ever will.

[¶ 7] The referee issued separate, but similar orders for the three children. The referee found the children were first adjudicated deprived in April 2011 and are still deprived, being without proper parental care or control, subsistence, education as

required by law, or other care or control necessary for their physical, mental or emotional health or morals. The referee found the children are in dire need of stability and have not formed a real attachment to their parents.

[¶ 8] The referee found it is in the best interests of the children that the parents' parental rights be forever terminated and ordered termination of those rights.

[¶ 9] The parents requested review of the referee's orders. A juvenile court adopted the referee's findings.

[¶ 10] The juvenile court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–20–03(1)(b). The parents' appeals are timely under N.D.C.C. § 27-20–56(1) and N.D.R.App.P. 2.2(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 27–20–56(1).

## II

[¶ 11] The mother argues the juvenile court decision should be reviewed de novo.

[¶ 12] We recently explained the law for review of parental termination cases:

We will not reverse a juvenile court's findings of fact in a termination case unless they are clearly erroneous, and the court's decision to terminate parental rights is a question of fact. *In re M.G.*, 2010 ND 157, ¶ 10, 786 N.W.2d 710. A finding is clearly erroneous when it is induced by an erroneous view of the law, there is no evidence to support the finding, or, on the basis of the entire record, this Court is left with a definite and firm conviction a mistake has been made. *Id.*

A court may terminate the parental rights of a parent if the child is deprived and the court finds "[t]he conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." N.D.C.C. § 27–20–44(1). The party seeking termination must prove the required elements by clear and convincing evidence. *M.G.*, 2010 ND 157, ¶ 10, 786 N.W.2d 710. Clear and convincing evidence is evidence that leads to a firm belief the allegations are true. *Id.*

*Interest of A.W.*, 2012 ND 153, ¶¶ 9–10, 820 N.W.2d 128.

[¶ 13] The mother relies primarily on *Interest of D.Q.*, 2002 ND 188, 653 N.W.2d 713, to argue the juvenile court's decision should be reviewed de novo. Her argument, however, is unpersuasive because *Interest of D.Q.* no longer controls review of termination proceedings after "this Court amended N.D.R.Civ.P. 52(a) to provide that findings of fact in juvenile matters shall not be set aside on appeal unless clearly erroneous." *Adoption of S.R.F.*, 2004 ND 150, ¶ 7, 683 N.W.2d 913. We therefore review the juvenile court's decision under the clearly erroneous standard. *See id.*

## III

[¶ 14] The mother argues the juvenile court erred because there was not clear and convincing evidence to support termination of parental rights under the three-part test in N.D.C.C. § 27–20–44(1), which provides, in part:

The court by order may terminate the parental rights of a parent with respect to the parent's child if:

a. The parent has abandoned the child;

b. The child is subjected to aggravated circumstances as defined under subsection 3 of section 27–20–02;

c. The child is a deprived child and the court finds:

(1) The conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; or

(2) The child has been in foster care, in the care, custody, and control of the department, or a county social service board, or, in cases arising out of an adjudication by the juvenile court that a child is an unruly child, the division of juvenile services, for at least four hundred fifty out of the previous six hundred sixty nights;

A

[¶ 15] The mother argues the juvenile court erred in finding the child was deprived under N.D.C.C. § 27–20–44(1), because the deprivation was not a result of her actions. She also argues there was insufficient evidence to prove that the children were deprived at the time of the juvenile court proceeding.

[¶ 16] The judicial referee found:

[The youngest child], to this day, is still a deprived child, being without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health or morals. This deprivation is not due primarily to the lack of financial means of the parents.

[¶ 17] Similar findings were made for the other two children. The juvenile court, in adopting the findings of the referee, stated:

Specifically as to [the mother], [the referee] found that the children's depri-

vation was due to her continued use of illegal drugs, that she had been incarcerated, released on parole, that she had violated her parole on at least one occasion and been sent back to prison. [The referee] found that she would remain on parole or probation for several years, which could again result in re-incarceration.... [The referee] found that, although [she] appeared to have remained sober for a few months, the sobriety was only in the context of a very controlled setting at a half-way house. [The referee] noted that [she] had begun to make progress [in] some of the areas of concern, but the progress was essentially, too little, too late.

[¶ 18] Those findings are supported by evidence in the record. Evidence at trial demonstrates that when the children were first taken into foster care, they were living in difficult circumstances, and the mother had been abusing drugs. Evidence also demonstrates the mother has been in and out of prison during the past few years, and she has continued to use drugs. "A finding is clearly erroneous when it is induced by an erroneous view of the law, there is no evidence to support the finding, or, on the basis of the entire record, this Court is left with a definite and firm conviction a mistake has been made." *Interest of A.W.*, 2012 ND 153, ¶ 9, 820 N.W.2d 128. Evidence supports the court's finding the children's deprivation was due to the mother's continued use of illegal drugs, among other things, and we are not left with a definite and firm conviction the court made a mistake.

B

[¶ 19] The mother argues the State failed to present sufficient evidence deprivation of the children was likely to continue and there would be physical, mental, moral, or emotional harm to the chil-

dren. The father also argues no evidence supports the finding that the conditions and causes of the deprivation would continue.

[¶ 20] Under N.D.C.C. § 27–20–44(1), there are two separate grounds for the termination of parental rights. The first ground is that the child is deprived and has been in foster care at least 450 out of the previous 660 nights. N.D.C.C. § 27–20–44(1)(c)(2). The second ground is that the child is deprived and the causes of the deprivation are likely to continue or will not be remedied, and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. N.D.C.C. § 27–20–44(1)(c)(1).

[¶ 21] The referee found termination of the parental rights in this case is supported on two separate and independent grounds, each of which is sufficient to terminate parental rights under N.D.C.C. § 27–20–44(1)(c). Under the first ground, the referee found the children are deprived and have been in foster care more than 450 out of the previous 660 nights. Under the second ground, the court found the children are deprived and deprivation is likely to continue.

[¶ 22] The finding that the children have been in foster care more than 450 out of the previous 660 nights is supported by the evidence. At trial, a social worker testified:

Q   As to the children, what date did the children enter foster care?

A   January 4th, 2011.

Q   And have they remained in foster care since January 4th, 2011?

A   Yes, they have.

Q   How many nights have the children spent in foster care then?

A   To date?

Q   Yes.

A   863.

Q   863 days?

A   Correct.

Q   Nights or days?

A   Well, both. Consecutive, yes.

Q   Okay. So it has been consecutive?

A   Yes.

[¶ 23] The evidence supports the finding that the children have been in foster care more than 450 out of the previous 660 nights. This finding is not clearly erroneous. In addition, we have already addressed the only challenge to the court's finding that the children are deprived, concluding the evidence supports that finding. Because a finding that the children have been in foster care more than 450 out of the previous 660 nights, along with a finding of deprivation, is sufficient to terminate parental rights under N.D.C.C. § 27–20–44(1)(c), it is unnecessary to address the parents' challenge to the finding that the conditions and causes of the deprivation will likely continue.

IV

[¶ 24] Both parents argue the State failed to make reasonable efforts to reunite the children with them under N.D.C.C. § 27–20–32.2(1).

[¶ 25] This Court has recognized that juvenile court findings regarding whether the State made reasonable efforts to reunify children with parents is reviewed under the clearly erroneous standard. *Interest of A.B.*, 2009 ND 116, ¶ 26, 767 N.W.2d 817 ("We conclude the juvenile court did not clearly err in finding that there was clear and convincing evidence that the State made reasonable efforts to reunify Amy and Allison.").

## A

[¶ 26] The father specifically claims the court abused its discretion in finding social services had made reasonable efforts to reunify the parents with the children, because a social worker testified their intention was not to reunify the children with him.

[¶ 27] At trial, a social worker assigned to the family, Jen Duletski, testified the intention was not to reunify the children with the father, stating, "Because custody [lay] with [the mother] and removal was from [her] home. So our reunification home was with [the mother]." Duletski testified, "We don't have the power to change custody. So for us to place with [the father], that's what it would be is a placement. Because he does not have custody, [the father] would have to go into family court and change custody over to him."

[¶ 28] Section 27–20–32.2, N.D.C.C., provides, in part:

1. As used in this section, "reasonable efforts" means the exercise of due diligence, by the agency granted authority over the child under this chapter, to use appropriate and available services to meet the needs of the child and the child's family in order to prevent removal of the child from the child's family or, after removal, to use appropriate and available services to eliminate the need for removal, to reunite the child and the child's family, and to maintain family connections. . . .

2. Except as provided in subsection 4, reasonable efforts must be made to preserve families, reunify families, and maintain family connections:

    . . . .

    b. To make it possible for a child to return safely to the child's home;

[¶ 29] Although testimony at trial demonstrates the primary goal was to reunify the children with the mother because she previously had custody, there nevertheless was a plan in place and diligent efforts were made to help the father get his children back. The juvenile court impliedly found social services made reasonable efforts to reunify the children with the parents when the court stated, "[The referee] had actually made the required findings regarding reasonable efforts" in a previous order entered in the deprivation cases. A finding that reasonable efforts were made is supported by the evidence.

[¶ 30] Kendra Casavant, a case worker for the family, testified, "[The father] asked numerous times what he could do to get his children." She testified she recommended that he obtain individual therapy, that he have supervised visits with his children, increasingly, and also that he attend parenting class and/or the nurturing program. She testified that in order to get the supervised visits, the father had to complete a psychiatric evaluation and go through orientation at the family safety center, but he still had not completed orientation at the safety center when the case was transferred to another social worker in June 2012. She testified the father "indicated to me that he would choose to work rather than make it to his appointments." Casavant testified he had scheduled appointments for which he would not show up, and he later talked about anxiety he had in regard to completing necessary orientation. She testified that she talked with the father about where he could go and how he could utilize services and that he indicated he understood what he needed to do.

[¶ 31] Evidence at trial demonstrates social services made reasonable efforts to reunify the father and his children, or at least to make him a candidate for place-

ment until custody could be changed. Failure to keep his appointments and make use of available services are what prevented the father from reuniting with his children, not any lack of due diligence by social services.

**B**

[¶ 32] The mother argues she should have been given supervised parenting time, especially after she had taken classes and learned parenting skills. She argues there was no possible way for her to complete all the necessary requirements of social services and therefore social services did not use reasonable efforts to reunite her with her children.

[¶ 33] Casavant, the family's case worker at the time, testified she brought the children to visit their mother while she was incarcerated. She testified that after the mother was back in the community, social services tried to get services set up and the mother did have visitation with the children. Casavant further testified, because the mother was still on inmate status, she was not eligible for certain services but could at least take part in a nurturing program and parenting classes. Casavant testified the mother was unable to follow through, however, because she was moved to the county jail in Dickinson. Casavant testified that once the mother was transferred to Centre (transitional housing), she discussed the requirements of the case with her, as she had done every time she visited with the mother, and she was signed up for the nurturing program and transportation was provided. Casavant testified that once the mother was no longer on inmate status, she completed the parental capacity evaluation but did not agree with certain aspects of the evaluation, so the mother did not release the information to her. She testified that when the case was transferred, she sus-

pected the mother was using drugs again because she was becoming more argumentative, she had more scabs or acne on her face, and she acted nervous when she was in meetings. Casavant testified, at that point the only thing the mother had completed was the nurturing program.

[¶ 34] This evidence demonstrates that throughout the process of the deprivation proceedings, social services made reasonable efforts to help the mother become qualified to have the children returned to her. *See Interest of E.R.*, 2004 ND 202, ¶ 13, 688 N.W.2d 384 ("The record evidence shows that assistance was offered. Martha, by her voluntary conduct in breaking the law resulting in her incarceration, derailed that assistance. She cannot now complain that assistance was not made available to her.").

[¶ 35] This evidence supports a finding that reasonable efforts were made to reunify the children with the parents under N.D.C.C. § 27–20–32.2. "The State is not required to 'exhaust every potential solution' before seeking termination of parental rights." *Interest of A.B.*, 2009 ND 116, ¶ 25, 767 N.W.2d 817.

**V**

[¶ 36] The mother argues the court erred in admitting testimony about statements made in reports of suspected child abuse or neglect, because those statements are hearsay and the reporting party for those reports must be available for cross-examination.

[¶ 37] When reviewing decisions to admit evidence, we apply an abuse of discretion standard. *Spitzer v. Bartelson*, 2009 ND 179, ¶ 12, 773 N.W.2d 798. We have also explained some specific rules for bench trials:

> We have said a trial judge in a nonjury case should ordinarily admit all evi-

dence which is not clearly inadmissible because a judge, when deliberating the ultimate decision, is capable of distinguishing between admissible and inadmissible evidence. Entry of incompetent evidence in a nonjury trial will rarely be reversible error while exclusion of competent evidence will cause reversal when justice requires. We presume a court in a bench trial considered only competent evidence. Consequently, it is not reversible error to admit incompetent evidence in a bench trial unless it induced an improper finding.

*McKechnie v. Berg*, 2003 ND 136, ¶ 7, 667 N.W.2d 628 (citations omitted).

■ [¶ 38] The judicial referee explained why he allowed introduction of the reports, stating, "We have a standing objection on record of the [report]. I'm still going to receive them to know why they get started. It doesn't mean that those things are true, and we'll listen to what the resulting investigation showed. But at least I know why they're there and what's going on." In a bench trial, we presume the court considers only competent evidence. *Interest of B.B.*, 2007 ND 115, ¶ 10, 735 N.W.2d 855. These statements indicate the referee, as fact-finder in this case, admitted the reports with the correct understanding of how to properly consider hearsay evidence. We conclude there was no abuse of discretion.

## VI

■ [¶ 39] The mother argues the juvenile court erred because it should have applied the Indian Child Welfare Act ("ICWA"), 25 U.S.C. §§ 1901–1963, to this proceeding, which has more stringent termination procedures than are typically provided by the State. The father does not make the same argument.

[¶ 40] ICWA, at 25 U.S.C. § 1903(1), provides:

(1) "child custody proceeding" shall mean and include—

(i) "foster care placement" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;

(ii) "termination of parental rights" which shall mean any action resulting in the termination of the parent-child relationship;

. . . .

(3) "Indian" means any person who is a member of an Indian tribe . . . ;

(4) "Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]

[¶ 41] For ICWA to apply, the child must qualify as an "Indian child." *See id.* The mother concedes the children are not members of an Indian tribe under 25 U.S.C. § 1903(4)(a). As a result, application of ICWA to this case hinges upon whether the mother or father is a member of an Indian tribe and whether the children are eligible for membership in an Indian tribe.

[¶ 42] The crux of the mother's argument is that the father and the children are eligible for enrollment in the Round Valley Indian Tribes in California, and the fact that the father is not enrolled in the tribe does not necessarily mean he is not a member of the tribe for purposes of the Indian status of their children.

[¶ 43] Whether the father is a member of the Round Valley Indian Tribes in California involves findings of fact and questions of law. *See Adoption of C.D.*, 2008 ND 128, ¶ 19, 751 N.W.2d 236 ("[I]t is for the state court to ... make the legal determination whether the child is an Indian child ... thereby triggering application of ICWA. Thus, the court must initially determine whether a tribe has concluded that the child or parent is a member or is eligible for membership in the tribe, and that determination by the trial court is a finding of fact."). When presented with a mixed question of law and fact, we review the questions of law subject to the de novo standard of review and the findings of fact subject to the clearly erroneous standard of review. *See Schirado v. Foote*, 2010 ND 136, ¶ 7, 785 N.W.2d 235.

[¶ 44] In *Adoption of C.D.*, we concluded an individual can be a member of an Indian tribe even if not enrolled in the tribe. *See* 2008 ND 128, ¶ 23, 751 N.W.2d 236 ("Mary's lack of enrollment in the Tribe is not dispositive of the issue of whether she is a member of the Tribe."). Although we held an individual can be a member of an Indian tribe without enrollment, we also concluded that an Indian tribe's determination of its own membership is binding and conclusive in an ICWA proceeding:

> An Indian tribe's determinations of its own membership and eligibility for membership are binding and conclusive in an ICWA proceeding. The rule is premised upon a tribe's inherent power to define and determine its own membership, which is central to its existence as an independent political community. Therefore, in determining whether ICWA applies, state courts may not second-guess the internal decision-making processes of the tribe in regard to its membership determination.

*Id.* at ¶ 18 (citations and quotation omitted).

[¶ 45] In this case, the juvenile court found the father is eligible for enrollment with the Round Valley Indian Tribes, but until he enrolls, the children are not eligible for enrollment. The court found the father made it very clear during his testimony that he purposefully did not enroll in the Tribe and has no intention of doing so. These findings are supported by the evidence.

[¶ 46] The ICWA director of the Round Valley Indian Tribes explained the father's relationship with the tribe:

> [The father] and his children are eligible for enrollment with the Round Valley Indian Tribes.
>
> When the children were removed from the care of the parents [the father] was not an enrolled member with the Round Valley Indian Tribes, ICWA did not apply.
>
> [The father] is still not an enrolled member with the Round Valley Indian Tribes, ICWA does not apply.
>
> . . . .
>
> This is the parent(s) responsibility to apply for enrollment with the Round Valley Indian Tribes during open enrollment.

[¶ 47] In addition, the father's testimony demonstrates that he had no intention of becoming an enrolled member of the tribe:

> Q Okay. And you have not enrolled because of lack of funding, also?
>
> A No. I haven't enrolled because I wanted social services to make sure that my children were doing okay. I didn't want to go to California. It's crazy. And I wanted to stay here in North Dakota and wanted my children to stay in North Dakota. I felt as long as I did, and social services asked

me to do parental capacity psychological, anger management, parent nurturing class, hundreds of books that I have read concerning subjects of proper parenting, nurturing your children, stages of education and child upbringing, and what they're capable of, that everything would be okay.

[¶ 48] The ICWA director of the Round Valley Indian Tribes determined the father is not an enrolled member of the tribe and ICWA does not apply. This determination is binding and conclusive. *See Adoption of C.D.*, 2008 ND 128, ¶ 18, 751 N.W.2d 236. On the evidence in this record, we are not left with a definite and firm conviction the juvenile court made a mistake in finding the children are not eligible for enrollment in the Round Valley Indian Tribes. *See also Adoptive Couple v. Baby Girl,* —— U.S. ——, 133 S.Ct. 2552, 186 L.Ed.2d 729 (2013) (discussing termination of parental rights under ICWA).

[¶ 49] Because the Round Valley Indian Tribe determined ICWA does not apply, we conclude, as a matter of law, ICWA does not apply in this case.

## VII

[¶ 50] We conclude the juvenile court's findings are supported by the evidence and are not clearly erroneous. We affirm the order terminating the parents' parental rights.

[¶ 51] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, LISA FAIR McEVERS, and CAROL RONNING KAPSNER, JJ., concur.