2016 ND 19

**TITAN MACHINERY, INC., Plaintiff, Appellee, and Cross–Appellant**

v.

**PATTERSON ENTERPRISES, INC., and Josh Patterson, Defendants**

**Patterson Enterprises, Inc., Defendant, Appellant, and Cross–Appellee.**

No. 20150025.

Supreme Court of North Dakota.

Jan. 21, 2016.

Jon R. Brakke (argued) and Neil J. Roesler (on brief), for plaintiff, appellee, and cross-appellant.

Sean T. Foss, Fargo, N.D., for defendant, appellant, and cross-appellee.

CROTHERS, Justice.

[¶ 1] Patterson Enterprises, Inc., appeals and Titan Machinery, Inc., cross-appeals from a judgment and an order denying their post-judgment motions after the district court ordered Patterson to pay Titan $88,707.75 due under several oral equipment leases. Patterson argues the district court erred in admitting into evidence an exhibit summarizing amounts Patterson owed Titan under the oral leases, the court erred in awarding Titan $5,617.63 for finance charges and the court erred in finding the equipment did not breach an implied warranty of merchantability. In its cross-appeal, Titan argues the court clearly erred in calculating the

amount Patterson owed Titan for three items of leased equipment. We affirm in part, reverse in part and remand for further proceedings.

## I

[¶ 2] Patterson is a Montana corporation headquartered in Missoula, which uses heavy equipment in the construction industry. Titan is an equipment rental company with several locations in the United States, including Missoula and Williston, North Dakota. In 2011, Patterson contracted for construction work in northwestern North Dakota and leased several items of heavy equipment from Titan. Patterson also leased several items of equipment from Titan for work on a remote dam project in Montana. The equipment leases were oral and were entered into by Don Hinricher, Titan's rental account manager in Missoula, and Adam Pummill, Patterson's general manager of operations in northwestern North Dakota. Disagreements arose between the parties concerning delinquent lease payments, damage to leased equipment, the operational condition of the leased equipment, and credits Patterson claimed for downtime and repairs to make the leased equipment operable.

[¶ 3] Titan sued Patterson, alleging Patterson failed to pay $164,958.71 for delinquent lease payments and equipment damages, plus $19,675.40 in accrued finance charges. Patterson answered and counterclaimed for damages, disputing the amounts owed under the leases and alleging Titan failed to provide Patterson equipment conforming to the leases, which resulted in Patterson's inability to perform substantial work for third parties.

[¶ 4] After a bench trial, the district court found Patterson owed Titan $73,852.31 for delinquent lease payments and damages to leased equipment. The court decided Titan's equipment did not breach an express warranty, an implied warranty of fitness for a particular purpose or an implied warranty of merchantability. The court found the parties impliedly agreed the leased equipment needed to be in working order when Patterson took possession and awarded Patterson $839.90 in costs incurred to put two items of leased equipment in working order. However, the court found Patterson failed to establish it was entitled to additional costs to fix the leased equipment. The court also found Patterson was not entitled to recover consequential damages for "wages paid to employees who sat idle when the equipment they were to operate did not work, cost of using substitute equipment that could have been working elsewhere, and other lost opportunities," because those claims were speculative and unforeseeable. The court denied Titan's post-judgment motion to amend the findings, to make additional findings or amend the judgment and for a new trial. Patterson's post-judgment motion to amend the findings, make additional findings and for amendment of the judgment also was denied.

## II

[¶ 5] Patterson argues the district court erred by admitting, under N.D.R.Ev. 1006, an exhibit summarizing Patterson's claimed debt to Titan. Patterson claims Titan emailed the exhibit after 9 p.m. the night before trial and did not make the information underlying debt summary available for inspection at a reasonable time and place before trial. Patterson also argues Titan did not establish the underlying information was admissible, and asserts the erroneous admission of the summary affected Patterson's substantial rights.

[¶ 6] Titan initially argues Patterson waived its argument on the admissibility of the debt summary because it did not raise the issue in its post-judgment "motion for reconsideration." Titan alternatively argues the district court did not abuse its discretion in admitting the debt summary into evidence and the admission of the summary was not prejudicial.

[¶ 7] Patterson's post-judgment motion was for amended findings, additional findings and for an amended judgment. We have not otherwise extended our jurisprudence about the necessity of preserving issues in a motion for new trial to other post-judgment motions. *See Andrews v. O'Hearn*, 387 N.W.2d 716, 728–29 (N.D. 1986) (waiver of appellate review of issues not raised in motion for new trial). Patterson did not make a motion for a new trial, and we conclude it has not waived appellate review of its argument about the admissibility of the debt summary.

[¶ 8] We review a district court's decision on the admissibility of evidence under the abuse-of-discretion standard. *In re R.L.–P.*, 2014 ND 28, ¶ 37, 842 N.W.2d 889. A district court abuses its discretion when its decision is arbitrary, capricious, or unreasonable, is a misapplication or misinterpretation of the law or is not the product of a rational mental process leading to a reasoned decision. *Community Homes v. Main*, 2011 ND 27, ¶ 11, 794 N.W.2d 204. We also have described a district court's role in ruling on evidentiary issues in a court trial:

"We have said a trial judge in a nonjury case should ordinarily admit all evidence which is not clearly inadmissible because a judge, when deliberating the ultimate decision, is capable of distinguishing between admissible and inadmissible evidence. Entry of incompetent evidence in a nonjury trial will rarely be reversible error while exclusion of competent evidence will cause reversal when justice requires. We presume a court in a bench trial considered only competent evidence. Consequently, it is not reversible error to admit incompetent evidence in a bench trial unless it induced an improper finding."

*In re R.L.–P.*, at ¶ 37 (quoting *McKechnie v. Berg*, 2003 ND 136, ¶ 7, 667 N.W.2d 628).

[¶ 9] During the March 2014 trial in this case, N.D.R.Ev. 1006,[1] provided:

"The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. The court may order the proponent to produce them in court."

[¶ 10] Rule 1006, N.D.R.Ev., authorizes a proponent to introduce a summary, chart or calculation to prove the content of voluminous writings, recordings or photographs that cannot be conveniently examined in court. The explanatory note to N.D.R.Ev. 1006 states a "condition precedent to the invocation of the rule that the component parts of the summary be made available for examination or copying . . . is . . . to give the party against whom the summary is offered a chance to analyze the underlying data and prepare any chal-

---

1. Rule 1006, N.D.R.Ev., was amended effective March 1, 2014, in response to 2011 revisions to Fed.R.Ev. 1006, to make the rule more easily understood and make style and terminology consistent throughout the rules without any intent to change the result in rulings on evidence admissibility. N.D.R.Ev. 1006 (Explanatory Note). *See also* Fed.R.Ev. 1006 (Advisory Committee's Note).

lenges to the summary." For a summary to be admissible, the underlying writings, recordings or photographs must be admissible. *Id.* The language of the rule does not delineate precisely when or how the summary must be provided to other parties; rather, the rule requires that the proponent make the originals or duplicates of the summarized writings, recordings or photographs available for examination or copying at a reasonable time and place. The rule also says the court may order the proponent to produce the summarized writings, recordings or photographs in court.

■ [¶ 11] Because the explanatory note to N.D.R.Ev. 1006 says the rule is based on Fed.R.Ev. 1006, we may rely on federal authorities in construing our derivative state rule. *E.g. State v. Thompson,* 2010 ND 10, ¶ 21, 777 N.W.2d 617. Federal authorities recognize that Fed. R.Ev. 1006 is an exception to the best evidence rule and allows the introduction of secondary evidence in the form of a chart, summary or calculation for voluminous writings, recordings or photographs that cannot be conveniently examined in court. 31 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 8042 (2000); 6 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 1006.02 (Joseph M. McLaughlin ed., Matthew Bender 2nd ed.2015). The rule makes the admission of summary evidence dependent upon the presence of safeguards to reduce the risk that the summary evidence may be inaccurate. Wright & Gold, at § 8045. The rule requires the proponent to make the original or duplicates of the source material underlying a summary available to other parties for examining or copying at a reasonable time and place and gives the court the power to order production of the originals or duplicates in court. *Id.*

Federal authorities recognize a court's determination of the voluminosity of the underlying writings and the convenience of examination in court involves the quantity and the complexity of the underlying source materials and give a trial court significant discretion. *Id.* at § 8044. The proponent must establish the summary accurately summarizes the source materials. Wright & Gold, at § 8045; Weinstein, at § 1006.07[1]. Any small deficiencies in the accuracy of the summary go to weight, not admissibility. *Id.* Moreover, the evidence underlying a summary must be admissible, but need not actually be admitted into evidence, and the court ultimately may order production of the originals or duplicates in court. Wright & Gold, at § 8045; Weinstein, at § 1006.06[3].

■ [¶ 12] Titan does not dispute it did not provide the debt summary to Patterson until after 9 p.m. the night before trial on March 4, 2014. However, Titan electronically filed and caused an exhibit list to be served on Patterson on February 28, 2014, which identified a "debt summary" as Titan's exhibit 1. Scott Bauer, the credit and risk manager for Titan, testified at trial that he was the Titan representative who prepared the debt summary after reviewing all of the business records, including invoices, account summaries and invoice details for Patterson's account with Titan. The debt summary identified the equipment rented, the rental period, the rental rate and the paid and unpaid portion for 18 items of equipment. The debt summary also identified charges for repairs and credits for certain items of equipment and interest charges. According to Bauer, information on the debt summary regarding the equipment rented, rental period and rental rate came directly from Titan's invoices to Patterson and the paid and unpaid amounts were

taken from Titan's "business system," which recorded when payments were applied to an invoice. At trial, Titan's counsel said the underlying information for the items summarized in the debt summary were included in exhibits which would be introduced during Bauer's testimony and had been provided to Patterson during discovery.

[¶ 13] Evidence establishes Titan's invoices to Patterson were kept in the ordinary course of business and were admissible. Evidence also establishes the information from Titan's somewhat amorphous "business system" was based upon calculations of the amount Titan believed was due under the relevant oral leases and the paid and unpaid invoices for each item of equipment. Titan's belated disclosure of the actual summary on the eve of trial may have been grounds for the district court to refuse to admit the document into evidence, to then require the production of the underlying information in court or to grant a continuance. The district court was the trier-of-fact and had to sort through Titan's "unreliable" billing system for invoices and records of payments on twelve separate oral leases. There was evidence the invoices underlying the debt summary were available to Patterson before the actual summary was provided to Patterson. There also was evidence the paid and unpaid invoices constituted voluminous writings that could not be conveniently examined in court. Moreover, the record reflects the parties' oral leases generally were negotiated over the phone between principals for Titan in Missoula and for Patterson in northwestern North Dakota and, as the court ultimately found, "everyone was flying by the seat of their pants to make things happen." Those circumstances do not excuse an imperfect application of N.D.R.Ev. 1006, and Titan could have more clearly established the

underlying sources for the debt summary at an earlier date. We do not condone the timing of Titan's disclosure of the debt summary and the imperfect application of the rule. However, we conclude the district court's decision to admit the debt summary into evidence was not arbitrary, capricious or unreasonable, was not a misapplication of the law and followed a rational mental process. Therefore, the court did not abuse its discretion in admitting the debt summary into evidence.

### III

[¶ 14] Patterson argues the district court erred in applying the law for finance charges on its debt to Titan. Patterson claims Titan improperly applied $5,617.63 of Patterson's lease payments to finance charges for late payments. Patterson argues the parties did not agree to finance charges as part of any of the oral leases and it was entitled to a credit of $5,617.63 for the amount Titan wrongfully applied to finance charges. Patterson claims Titan did not intend to extend credit beyond thirty days or anticipate late payment under N.D.C.C. § 13–01–14, and also did not provide Patterson with billing statements required by N.D.C.C. § 13–01–15. Titan responds it met all the statutory requirements of N.D.C.C. §§ 13–01–14 and 13–01–15 to impose the finance charges and the court's application of $5,617.63 towards finance charges was not clearly erroneous as an element of damages stemming from Patterson's breach of the equipment leases.

[¶ 15] This Court has recognized N.D.C.C. §§ 13–01–14 and 13–01–15 apply to finance charges on accounts receivable when no contractual provision explicitly authorizes the finance charges. *See Industrial Fiberglass v. Jandt*, 361 N.W.2d 595, 600 (N.D.1985); *Metric Constr., Inc.*

*v. Great Plains Properties,* 344 N.W.2d 679, 682–83 (N.D.1984). Under N.D.C.C. § 13–01–14(1), a creditor may charge "a late payment charge on all money due on account from thirty days after the obligation of the debtor to pay has been incurred." "The [statutory] late payment charge … may not exceed one and three-fourths percent per month" and "may not be charged unless, when the obligation was incurred, the creditor did not intend to extend any credit beyond thirty days and any late payment of the obligation was unanticipated." N.D.C.C. § 13–01–14(2) and (3). "A creditor may not charge the account receivable late payment charge provided for under section 13–01–14 … unless the creditor promptly supplies the debtor with a statement as of the end of each monthly period, or other regular period agreed upon … in which there is any unpaid balance." N.D.C.C. § 13–01–15(1). The statement must identify "a. [t]he percentage amount of the late payment charge which will be charged beginning thirty days after the obligation is incurred for purposes of section 13–01–14 … [,] b. [t]he unpaid balance at the end of the period[,] c. an identification of any amount debited to the debtor's account during the period[,] d. the payments made by or for the debtor to the creditor during the period[, and] e. [t]he amount of the late payment charge." N.D.C.C. § 13–01–15(2)(a–e).

[¶ 16] In *Royal Jewelers, Inc. v. Kopp,* 365 N.W.2d 525, 527 (N.D.1985), a debtor argued N.D.C.C. § 13–01–14 was not applicable to service charges on the balance of an open account "because it was apparent that credit would be extended beyond thirty days and that late payment was anticipated." This Court said no evidence existed of a written contract authorizing finance charges, and "unless [N.D.C.C. § ] 13–01–14 applie[d], there [was] no legal or contractual basis for a 1.5% per month

finance charge, and [the creditor] would be limited to the presumed rate of interest of 6% per annum under N.D.C.C. § 47–14–05." *Royal Jewelers,* at 527. This Court concluded no findings existed about whether the creditor intended to extend credit to the debtor beyond thirty days or whether late payment was anticipated under N.D.C.C. § 13–01–14. *Royal Jewelers,* at 527. This Court reversed and remanded the award of late payment charges for findings on the predicate facts for the applicability of N.D.C.C. § 13–01–14. *Royal Jewelers,* at 527.

[¶ 17] The determination of damages caused by a breach of contract is a question of fact subject to the clearly erroneous standard of review. *Langer v. Bartholomay,* 2008 ND 40, ¶ 27, 745 N.W.2d 649. In *Edward H. Schwartz Const., Inc. v. Driessen,* we outlined our standard of review of findings of fact under the clearly erroneous standard:

> "A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction the trial court made a mistake. A trial court's choice between two permissible views of the weight of the evidence is not clearly erroneous, and simply because we may have viewed the evidence differently does not entitle us to reverse the trial court. On appeal, we do not reweigh conflicts in the evidence, and we give due regard to the trial court's opportunity to judge the credibility of the witnesses."

2006 ND 15, ¶ 6, 709 N.W.2d 733 (quoting *Brandt v. Somerville,* 2005 ND 35, ¶ 12, 692 N.W.2d 144). A district court's findings of fact must enable an appellate court to understand the factual determinations

and the court's decision. *Niska v. Falconer*, 2012 ND 245, ¶ 10, 824 N.W.2d 778.

[¶ 18] The parties operated under oral equipment leases and Titan does not claim the leases explicitly authorized late payment charges. Evidence showed Titan applied $5,617.63 to late payment charges from payments made by Patterson during the course of the oral leases. The district court decided the net amount Patterson owed Titan was $73,012.41 and awarded 6 percent prejudgment interest on that amount from December 2, 2011. The court's findings, however, did not address late payment charges or the predicate facts for the applicability of N.D.C.C. §§ 13–01–14 and 13–01–15 as a component of damages. We are unable to understand the basis for the court's decision regarding late payment charges as a component of Patterson's obligations to Titan. We reverse the judgment and remand for findings addressing this issue.

## IV

[¶ 19] Patterson argues the district court erred in deciding it failed to produce evidence supporting its claim for breach of an implied warranty of merchantability for the leased equipment. Patterson claims the court made contradictory findings about whether the standard for merchantability was established and improperly concluded Patterson did not submit evidence to establish the standard of merchantability was violated. Patterson asserts the court found an implied term of the oral lease agreements included a requirement the leased equipment needed to be in working order when possession was given to Patterson. Patterson also asserts it presented evidence showing some equipment was not working when delivered. Titan responds Patterson failed to establish a claim for breach of an implied warranty of merchantability and ample evidence rebutted Patterson's claims about problems with the leased equipment.

[¶ 20] In 1991 the legislature enacted N.D.C.C. ch. 41–02.1 from the Uniform Commercial Code [U.C.C.] art. 2A, relating to leases of goods. *See* 1991 N.D. Sess. Laws ch. 448. *See also* N.D.C.C. §§ 41–02.1–01 [U.C.C. § 2A–101] (stating N.D.C.C. ch. 41–02.1 may be cited as the Uniform Commercial Code–Leases) and 41–02.1–02 [U.C.C. § 2A–102] (defining scope of N.D.C.C. ch. 41–02.1 as transactions creating a lease).

[¶ 21] Section 41–02.1–22, N.D.C.C. [U.C.C. 2A–213], says a lessor impliedly warrants leased goods will be fit for a particular purpose if, at the time of the lease, the lessor "has reason to know of any particular purpose for which the goods are required and that the lessee is relying on the lessor's skill or judgment to select or furnish suitable goods." Section 41–02.1–21, N.D.C.C. [U.C.C. § 2A–212], imposes an implied warranty of merchantability for lease contracts if the lessor is a merchant of goods of that kind and provides:

"1. Except in a finance lease, a warranty that the goods will be merchantable is implied in a lease contract if the lessor is a merchant with respect to goods of that kind.

"2. Goods to be merchantable must:

"a. Pass without objection in the trade under the description in the lease agreement;

"b. In the case of fungible goods, be of fair average quality within the description;

"c. Be fit for the ordinary purposes for which goods of that type are used;

"d. Run, within the variation permitted by the lease agreement, of even kind, quality, and quantity within

each unit and among all units involved;

"e. Be adequately contained, packaged, and labeled as the lease agreement may require; and

"f. Conform to any promises or affirmations of fact made on the container or label.

"3. Other implied warranties may arise from course of dealing or usage of trade."

[¶ 22] Under the statutory warranty, a merchant impliedly warrants leased goods are merchantable unless that warranty is excluded or modified under the requirements of N.D.C.C. § 41–02.1–23 [U.C.C. § 2A–214]. *See* 4C Lary Lawrence, *Anderson on the Uniform Commercial Code* 2A–212:36 (3rd ed.2010) (discussing U.C.C. § 2A–212). A "merchant" means "a person who deals in goods of the kind or otherwise by the person's occupation holds out as having knowledge or skill peculiar to the practices or goods involved in the transaction." N.D.C.C. §§ 41–02–04 [U.C.C. § 2–104]. *See* N.D.C.C. § 41–02.1–03(3)(j) [U.C.C. § 2A–103] (incorporating definition of merchant from N.D.C.C. § 41–02–04 into N.D.C.C. ch. 41–02.1). Section 41–02.1–23 [U.C.C. § 2A–214] deals with exclusions or modifications of warranties in leases and provides, in relevant part:

"2. Subject to subsection 3, to exclude or modify the implied warranty of merchantability or any part of it the language must mention 'merchantability', be by a writing, and be conspicuous. Subject to subsection 3, to exclude or modify any implied warranty of fitness the exclusion must be by a writing and be conspicuous. Language to exclude all implied warranties of fitness is sufficient if it is in writing, is conspicuous and states, for example, 'There is no warranty that the goods will be fit for a particular purpose'.

"3. Notwithstanding subsection 2, but subject to subsection 4:

"a. Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', or 'with all faults', or by other language that in common understanding calls the lessee's attention to the exclusion of warranties and makes plain that there is no implied warranty, if in writing and conspicuous;

"b. If the lessee before entering into the lease contract has examined the goods or the sample or model as fully as desired or has refused to examine the goods, there is no implied warranty with regard to defects that an examination ought in the circumstances to have revealed; and

"c. An implied warranty may also be excluded or modified by course of dealing, course of performance, or usage of trade."

[¶ 23] One noted commentator on the Uniform Commercial Code recognizes that unless excluded or modified, a merchant lessor of goods impliedly warrants, at a minimum, the leased goods conform to the contract and to the requirements of U.C.C. § 2A–212(2) [N.D.C.C. § 41–02.1–21(2) ] and that a failure of the goods to comply with the statutory criteria for merchantability establishes a breach of the implied warranty of merchantability. *Anderson,* at § 2A–212:32. Professor Lawrence explains that U.C.C. § 2A–212 [N.D.C.C. § 41–02.1–21] establishes a minimum statutory standard for merchantability and indicates a lessee may establish a breach of that statutory implied standard by showing the leased goods are not fit for the ordinary purposes for which goods of that

type are used. *Anderson,* at §§ 2A–212:32–2A–212:35.

[¶ 24]  Here, the parties had oral leases without any written exclusions or modifications of the implied warranty of merchantability.  The district court's findings about Patterson's warranty claims provide:

"The equipment that [Patterson] leased was used equipment. [Patterson] was well aware that the equipment was used and not new.

"Titan provided no express warranties with the equipment leased to [Patterson].

"There was no breach by Titan of any implied warranty of fitness for a particular purpose as [Patterson] made its own selection of equipment from what was offered without relying on Titan to select it.

"[Patterson] failed to prove a breach of any implied warranty of merchantability.  [Patterson] acknowledged that used equipment breaks down from time to time and that [Patterson] was responsible for ordinary maintenance of equipment leased from Titan.  The Court finds this to be a fact.

"[Patterson] did not provide evidence to establish the standard of merchantability that exists in the lease and use of heavy construction equipment.

"All parties agreed, and the Court finds, that the implied agreement of the parties included the requirement that the equipment needed to be in working order when possession was given to [Patterson] as lessee.

. . . .

"The agreement between Titan and [Patterson], and the standard in the equipment rental business, was for equipment to be in working order when delivered.  In some instances, [Patterson] has claimed that the delivered equipment was not in working order.  The costs incurred by [Patterson] to put equipment in working order prior to using equipment would be considered incidental damages.  [Patterson's] proof was for the most part not documented, and the amounts claimed were speculative.  [Patterson's] incidental damages should be limited to [$839.90].

"Incidental losses for other machines have not been proven by [Patterson]. Those losses testified to in general terms were not sufficiently documented and the distinction between maintenance, which was [Patterson's] responsibility (after delivery), and repairs for deficiencies of machinery upon arrival were blurred.  [Patterson] failed to sustain its burden on those issues."

[¶ 25]  The district court found Patterson failed to prove a breach of an implied warranty of merchantability and did not provide evidence to establish the standard of merchantability that exists in the lease and use of heavy construction equipment. The court also stated the parties agreed there was an implied agreement that the equipment needed to be in working order when Patterson took possession as lessee. The court's findings suggest that Patterson needed to provide evidence separate from the statutory requirements of merchantability in order for the implied warranty to exist or to be breached.  The court's findings do not address the statutory standard for merchantability in N.D.C.C. § 41–02.1–21(2) [U.C.C. § 2A–212(2) ] that goods must be fit for the ordinary purposes for which goods of that type are used.  Nor does the court explain if course of dealing, course of performance or usage of trade was part of the court's analysis.  We are unable to understand and reconcile the district court's determination about Patterson's failure to provide evidence regarding the standard for the implied warranty of merchantability in the

lease and use of heavy construction equipment and the statutory requirement for merchantability in N.D.C.C. § 41–02.1–21(2) [U.C.C. § 2A–212(2)], which requires goods to be fit for the ordinary purposes for which goods of that type are used. We reverse and remand for findings about the implied warranty of merchantability.

## V

[¶ 26] Titan cross-appeals and argues the district court clearly erred in calculating the rent owed by Patterson for three pieces of equipment, a Caterpillar 815F sheepsfoot packer, a SD84 roller and a Bomag BW213 roller. Titan claims it is entitled to an additional $47,433.50 for those three pieces of equipment because objective evidence conclusively establishes the court erred in determining the amount due from Patterson.

[¶ 27] The district court heard evidence about the amount owed on those specific items of equipment and found Titan double billed the Caterpillar 815F for three weeks on one occasion and for a month on another occasion. The court also found Titan failed to prove the length of the rental period for the SD84 roller and the Bomag BW213 roller was a rent-to-own transaction which was completely paid. Evidence supports the court's findings on those items of equipment, and we do not reweigh that evidence on appeal. *Driessen*, 2006 ND 15, ¶ 6, 709 N.W.2d 733. We are not left with a definite and firm conviction the court made a mistake in calculating Patterson's lease payments for those items of equipment. The court's findings about the lease payments owed for those items of equipment are not clearly erroneous.

## VI

[¶ 28] We affirm in part, reverse in part, and remand for further proceedings.

[¶ 29] BRUCE B. HASKELL, D.J., LISA FAIR McEVERS and DALE V. SANDSTROM, JJ., concur.

GERALD W. VANDE WALLE, C.J., concurs in the result.

[¶ 30] The Honorable BRUCE B. HASKELL, D.J., sitting in place of KAPSNER, J., disqualified.